The PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., Plaintiffs,

v.

UNITED STATES GYPSUM COMPANY et al., Defendants.

Nos. CIV. 87–4227 HAA,
CIV. 87–4238 HAA.

United States District Court,
D. New Jersey.

June 20, 2001.

**OPINION**

ACKERMAN, District Judge.

This matter comes before the Court on a motion by defendant United States' Gypsum Company ("Gypsum") for partial summary judgment against plaintiff, the Prudential Insurance Company of America ("Prudential") on the grounds of *res judicata* or lack of subject matter jurisdiction; for summary judgment dismissing Prudential's Racketeer Influenced and Corrupt Organizations Act ("RICO") claims as barred by the statute of limitations; and for summary judgment dismissing Prudential's RICO claims on substantive grounds. For the reasons stated below, Gypsum's

requests are granted in part and denied in part.

## I. Background

In 1987, Prudential brought a complaint against seven former manufacturers of asbestos-containing materials ("ACMs") to recover costs for monitoring, removing and dealing with ACMs used in Prudential's buildings. Prudential's complaint originally encompassed sixty-one buildings and now includes eighteen buildings. The current active defendants in the action are U.S. Gypsum and United States Mineral Products Company ("USMP"). Prudential also has outstanding claims against Asbestospray Corporation ("Asbestospray") [1] and W.R. Grace & Co.-Conn ("Grace"). Grace and Gypsum filed papers joining their defenses of the motions presently before this court. Grace, however, filed a voluntary petition for relief pursuant to Chapter 11, Title 11 U.S.C. on April 2, 2001, prior to oral argument of this motion. As a result of provisions of 11 U.S.C. § 362(a), this matter is automatically stayed against Grace. Having found no unusual circumstances that would cause the matter to be stayed as to the remaining co-defendants (*See McCartney v. Integra National Bank North*, 106 F.3d 506, 510 (3d Cir.1997)), this matter will proceed as to the remaining defendants.

Subject matter jurisdiction for Prudential's original Complaint was based solely on a claim arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). The court dismissed Prudential's CERCLA claim on March 28, 1989, but granted Prudential's motion for leave to file a First

---

1. Robert J. Gilson, counsel for Prudential, indicated to this court that Asbestospray "went out of business and dissolved back in the seventies, and my understanding is that they exhausted all insurance proceeds, and what was left was simply placed into court with the inaction trying to say we have about $3 million of insurance proceeds left and we have hundreds of millions of dollars in claims." Transcript of Proceedings, April 18, 2001, p7. Mr. Gilson also indicated that Prudential is seeking leave against Asbestospray, but that "at present they have not participated." *Id.*

Amended Complaint that added nine new counts, including a RICO claim, which then became the sole basis for federal jurisdiction.

U.S. Gypsum and Grace had previously defended against a class action in which Prudential was initially determined to be a member of the plaintiff class, *Prince George Center, Inc., et al. v. United States Gypsum Co. et al.,* 1997 WL 1433730, No. 5388 (Pa.Com.Pl.)(hereinafter *"Prince George Center "*), litigated in the state courts of Pennsylvania. *Prince George Center* settled claims relating to buildings that "were leased in whole or in part to the United States or any agency thereof at any time between April 30, 1984 and December 22, 1994 inclusive and contained asbestos-containing products at any time during such period. . . ." Plaintiff's Second Brief in Opposition to Motions by Defendants For Partial Summary Judgment, p4. Prudential subsequently petitioned the Pennsylvania Court of Common Pleas to be excluded from the class. Prudential's arguments included assertions that it had inadvertently failed to send a letter opting out of the class; that it was unaware of its inclusion in the class settlement; and that the defendants knew of the Prudential's failure to opt out but did not notify either this court or Prudential of the settlement prior to its finalization. Prudential appealed the Court of Common Plea's adverse decision to the highest court of Pennsylvania and to the United States Supreme Court without success.

In the motions currently before the court, Gypsum asserts that Prudential's claims as to eight of the eighteen buildings are precluded by the *Prince George Center* class action.[2] Gypsum also asserts that under the *Rooker–Feldman* doctrine, this court lacks subject matter jurisdiction to hear Prudential's claims in this case. Prudential responds that Gypsum is estopped from using the *Prince George Center* judgment in this case for three reasons: because Gypsum stipulated to try claims related to all eighteen buildings in this court; because Gypsum breached its ethical duties; and because Gypsum made affirmative misrepresentations in interrogatory answers. Prudential further contends that Gypsum waived the use of the *Prince George Center* judgment in this action. Even if this court finds that Gypsum is not estopped and did not waive use of the *Prince George Center* decision, Prudential argues that Gypsum has not proven that the eight buildings fall within the *Prince George Center* class.

Gypsum also contends that the statute of limitations had run on Prudential's RICO claim, the only claim tying the case to federal court, before Prudential filed its case in October of 1987. U.S. Mineral joins Gypsum in this motion. Prudential responds that it only learned of its injuries when it undertook abatement of asbestos in conjunction with the demolition of one of its buildings in 1984, and only understood the extent of its injuries after commissioning a study of the ACMs in its holdings in 1985. Prudential also claims that the statute of limitations period was tolled by Gypsum's fraudulent concealment of the hazards of ACM.

---

**2.** While Gypsum allegedly produced the asbestos in only three of the eight buildings that arguably fall within the *Prince George Center* settlement, since Prudential indicated at the April 18, 2001 hearing that it intended to hold Gypsum liable for Prudential's claims as to all eighteen buildings in this action on a conspiracy theory, Gypsum proceeded with its affirmative defense of *res judicata* as to all eight of the buildings. *See* Transcript of Proceedings, April 18, 2001, pp9–13. This court has not yet ruled on Prudential's assertion of conspiracy.

This court will first address Gypsum's claims as to the court's subject matter jurisdiction and the preclusive effects of the *Prince George Center* judgment on this case. The court will then turn to Gypsum's statute of limitations claims.

## II. Subject Matter Jurisdiction and Preclusion

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.), *cert. dism'd*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. *Id.* at 248, 106 S.Ct. 2505.

The party seeking summary judgment always bears the initial burden of production, i.e., of making a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that

as a matter of law, the moving party must prevail or by demonstrating that the moving party has not produced evidence relating to an essential element of the issue for which it bears the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden of proof as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. 2548.

At the summary judgment stage, however, a court may not weigh the evidence or make credibility findings-these tasks are left to the factfinder. *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224, 1230 (3rd Cir.1993). Therefore, to raise a genuine issue of material fact, " 'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.* See also *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("the mere existence of a scintilla of evidence in support of the [nonmovant's ] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")

### B. Rooker–Feldman

Gypsum contends that under the *Rooker–Feldman* doctrine, Prudential is barred from bringing its claims of estoppel and waiver. The *Rooker–Feldman* doctrine holds that a federal district court does not have jurisdiction to review a final adjudication of a state court or to consider claims that are inextricably intertwined with the state court decision. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *In re: General Motors Corp. Pick–Up Truck Fuel Tank Products Liability*, 134

F.3d 133 (3d Cir.1998). The Third Circuit has found that *Rooker–Feldman* is a jurisdictional doctrine grounded in the principle that appellate jurisdiction over state court decisions lies with the Supreme Court of the United States, not with federal district courts. *Parkview Associates Partnership v. Lebanon,* 225 F.3d 321, 329 (3d Cir. 2000). As such, it is distinct from preclusion doctrines, which rest upon the Full Faith and Credit Statute. *Id.* Moreover, as a jurisdictional doctrine, *Rooker-Feldman* "must override preclusion doctrine where it applies." *Id.* Therefore, this court will first consider whether the *Rooker–Feldman* doctrine applies in this case.

Gypsum contends that because the Pennsylvania Court of Common Pleas already decided issues essential to Prudential's claims of estoppel and waiver, if this court were also to hear and decide these claims, it would effectively be reviewing and potentially reversing the Pennsylvania court. Prudential responds that it is not seeking reversal of the Pennsylvania judgment and grants the Pennsylvania judgment preclusive effect in all other future proceedings. Instead, Prudential attempts to demonstrate that the Pennsylvania decision should not be given preclusive effect in the instant case because it would not be given such effect under Pennsylvania law. Specifically, Prudential argues that, for purposes of this New Jersey action, the defendant waived the use of the Pennsylvania judgment and is estopped from the use of that judgment.

As Gypsum points out, the Pennsylvania court already made findings on the same issues that ground Prudential's claims of waiver and estoppel. Prudential is not, however, seeking relief from the Pennsylvania court's decision, but instead is seeking to determine whether Gypsum has waived or is estopped from asserting that the Pennsylvania opinion is *res judicata.*

The doctrines of waiver and *res judicata* are not intended to provide relief for the plaintiff from prior judgments but rather to preclude the defendant from obtaining an inequitable result. Therefore, if this court were to determine that Gypsum has waived or is estopped from raising its claims in the instant action, this court's decision would not effectively reverse the Pennsylvania court's decision that Prudential may not opt out of the class action generally. Prudential would still be bound by the Pennsylvania decision, except where Pennsylvania law would find that the defendant should not be so bound. Unless this court would effectively reverse the state court's decision, the *Rooker–Feldman* doctrine is not implicated in this action.

Gypsum's attempt to analogize the facts of this case to those of *GM Motors,* in which the *Rooker–Feldman* doctrine precluded a district court from reversing a state court judgment, does not succeed. In the *GM Motors* case, the plaintiffs had been party to a class action, in which a district court's certification of the class was vacated and a settlement set aside. Rather than cure the defect in the certification, representatives of the parties proceeded to settle the class action in state court in Louisiana. Certain members of the plaintiff class sought relief from the Louisiana judgment in federal court, but the Third Circuit rejected their claim on the ground that "in order for us to grant appellants' requested relief, we would first have to determine that the state court judgment was erroneously entered. *Rooker–Feldman* bars exactly this sort of intermediate appellate review of state court judgments and divests this Court of subject matter jurisdiction of this appeal." *GM Motors,* 134 F.3d at 143.

Because Prudential's defenses are not intended to provide relief from the Penn-

sylvania judgment but only to give that judgment the same effect in federal court that it would have in a Pennsylvania court, this court's decision is not barred on jurisdictional grounds. Instead, Gypsum's concerns are more appropriately addressed under preclusion doctrines, which provide a measure of repose and protect parties from having to litigate the same claims or issues in different jurisdictions.

## C. Prudential's Claims of Estoppel and Waiver

■ As both parties agree, the decision of the Pennsylvania Court of Claims should be granted full faith and credit. *See* U.S. Gypsum's Memorandum of law, p24; Prudential's Brief, vol. I, p16. Section 1738 of chapter 28 of the United States Code Annotated provides that the judicial proceedings of any state shall be given full faith and credit "in every court within the United States." The U.S. Supreme Court has held that "many courts" encompasses federal courts. *See Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Davis v. Davis*, 305 U.S. 32, 40, 59 S.Ct. 3, 83 L.Ed. 26 (1938). Therefore, this court must give the Pennsylvania court's final judgment the same effect as such judgment would be given in Pennsylvania, including claim preclusive and issue preclusive effect. *See Balent v. City of Wilkes–Barre*, 542 Pa. 555, 669 A.2d 309, 313 (1995).[3]

■ The question then is which, if any, of the claims or issues currently before this court were previously decided by the Court of Common Pleas. In Pennsylvania, issue preclusion applies if:

> (1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Greenleaf v. Garlock, Inc.* 174 F.3d 352, 357–58 (3d Cir.1999).

Prudential claims that Gypsum is estopped from using the *Prince George Center* judgment in this action for three reasons. First, by signing the Pretrial Order in March of 1996 in this matter and failing to notify this court of the *Prince George Center* Settlement before September of 1996, Prudential contends that Gypsum stipulated to try claims related to all eighteen buildings. Second, Prudential claims that Gypsum is estopped due to its breaches of two rules of professional conduct, RPC 3.3 and RPC 1.7, by failing to disclose to this Court the existence of the *Prince George Center* settlement and by failing to advise Prudential of a conflict of interest on the part of Gypsum's law firm, Morgan, Lewis & Bockius, ("MLB"), respectively. Third, Prudential asserts that Gypsum is estopped because it made affirmative misrepresentations in interrogatory answers. Prudential also argues that Gyp-

---

**3.** The Court notes that Wright and Miller advocate that the term *"res judicata"* be employed as an umbrella which encompasses both claim and issue preclusion. *See* 18 Wright and Miller § 4402 (1981). According to Wright and Miller, claim preclusion provides that "a judgment, once rendered [is] the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.' "; issue preclusion bars "the re-

litigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties." Wright and Miller note, however, that the Supreme Court continues to distinguish between *res judicata*, or claim preclusion and collateral estoppel, or issue preclusion. When possible, the court will refer to claim and issue preclusion; it will otherwise follow Wright and Miller's use of *res judicata*.

sum waived the use of the *Prince George Center* judgment when it continued to litigate this case after entering into settlements in the Pennsylvania case.

Gypsum argues, however, that in the *Prince George Center* action, Prudential litigated certain of the issues that underlie Prudential's estoppel and waiver claims in this action. Prudential correctly asserts that only this court can determine whether the defendant's conduct waives or estops it from use of the *Prince George Center* judgments in this action. If the issues underlying estoppel and waiver have already been decided in another court of competent jurisdiction, however, then this court must grant those decisions full faith and credit.

██ This court finds that least one of Prudential's grounds for estoppel was litigated and decided in the *Prince George Center* action. Specifically, Prudential contended that Gypsum violated RPC 3.3 by not revealing the existence of the *Prince George Center* settlement to the Newark court before the final settlement had been entered. The Court of Common Pleas specifically ruled that Gypsum did not violate RPC 3.3. *See Prince George Center,* 33 Phila.Co.Rptr. 151, 170–172, 1997 WL 1433730 (1997). In its decision, the Court of Common Pleas referenced Prudential's claim that it was "sandbagged" by the defendant's vigorous litigation of the New Jersey action and rejected "this specious argument." *Prince George Center* at 22. According to the court: "To the extent [Prudential] operated in the dark, it pulled the curtain down on itself." *Prince George Center* at 26. Therefore, the court concluded that since Prudential and not the defendant's counsel had a duty to track the *Prince George Center* action, defense counsel did not have a duty to report the action to the Newark court at all. According to that court, "Since defen-

dants' counsel had no duty to speak, there was no necessity for them to make disclosure which is a prerequisite for application of Rules 3.3(b) and 4.1." *Id.* at 25–26. Although the Pennsylvania court's ruling appears to rest on that court's evaluation of the duties of respective counsel to monitor the *Prince George Center* settlement, Prudential contends that the Pennsylvania court's ruling would have been different under New Jersey law because New Jersey enforces a uniquely strict duty of disclosure. If it is true that the instant court would apply a different legal standard, then Prudential's argument is not precluded. *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4417 (indicating that differences in legal standards defeat claims of preclusion, even though the factual setting of two suits in the same.) Therefore, this court will consider Prudential's claim under New Jersey's standard for RPC 3.3. This court finds, however, that application of New Jersey's law concerning RPC 3.3 does not alter the fact that ultimately Prudential and not the defendant had the duty to report the *Prince George Center* settlements to this court.

Rule 3.3, which defines an attorney's duty of "Candor Towards the Tribunal", provides:

(a) A Lawyer shall not knowingly:

(1) make a false statement of material fact or law to a tribunal; [or] . . . .

(5) fail to disclose to the tribunal a material fact with knowledge that the tribunal may tend to be mislead by such failure.

RPC 3.3(a)(1),(5). These ethical rules apply in the New Jersey federal district court pursuant to Local Civil Rule 103.1. As Prudential points out, New Jersey courts require an affirmative duty of disclosure and have held that such disclosure is superior to the attorney's duties to his

clients. *See Crispin v. Volkswagenwerk, A.G.,* 96 N.J. 336, 476 A.2d 250 (1984); *Itel Containers International Corp. v. Puerto Rico Marine Management, Inc.,* 108 F.R.D. 96, 104 (D.N.J.1985) (quoting *Van Berkel v. Fox Farm & Road Machinery,* 581 F.Supp. 1248, 1251 (D.Minn.1984)). While the cases Prudential cites each address fact patterns in which an attorney is sanctioned for failing to disclose a fact which would impact the court's determination of an issues (*See Crispin,* 96 N.J. 336, 476 A.2d 250; *Matter of Stein,* 97 N.J. 550, 483 A.2d 109 (1984); *Kernan v. One Washington Park Urban Renewal Assoc.,* 154 N.J. 437, 713 A.2d 411 (1998); *Matter of Norton,* 128 N.J. 520, 608 A.2d 328 (1992)), the comments to RPC 3.3(a)(5) indicate that the disclosure obligation also applies to "facts relating the management of the case." 114 N.J.L.J. at Supp. 9 (July 19, 1984).

Prudential alleges that defense counsel had a duty to disclose to this court the existence of settlements in the *Prince George Center* action that could impact buildings in the New Jersey litigation, beginning with the initial entry of the settlement in March of 1996 and up to any time *before* the entry of the judgment finalizing that settlement in September of 1996 when Gypsum did notify the court of the settlement. Prudential asserts that the conferences and discovery that continued in that five and half month period were unnecessary in light of the settlement.

Nevertheless, while Gypsum may have speculated that Prudential had forgotten to opt out of the trial class and was not, therefore, aware that its litigation of the New Jersey action was in conflict with its position in the *Prince George Center* class action, there was no reason for Gypsum to be sure that Prudential was not simply waiting to opt out of the class action settlement, or that the *Prince George Center* settlement would even be entered. Indeed, Prudential belatedly filed its opt-out request from the first settlement class in *Prince George Center,* and the Pennsylvania court honored Prudential's belated request. Therefore, without knowledge of what Prudential would seek to do or what leeway the Pennsylvania court would allow Prudential in its participation in the *Prince George Center* action, Gypsum had a responsibility to continue to vigorously litigate the New Jersey action. Upon the final entry of the judgment, Gypsum notified this court of the conflict. Even then, Prudential attempted to continue to litigate the New Jersey action while it sought to be excluded from the Pennsylvania final judgment. *See* Transcript of Case Management Conference, Plaintiffs' Supporting Appendix Concerning the Prince George Motions, p. 453.

Only Prudential knew both of the conflicting actions and its intentions with regard to each. Its assertion that it forgot to opt out of the *Prince George Center* action, but that the Gypsum should have known of its intentions and informed this court of the potential conflict borders on the absurd. It seems clear from Prudential's arguments in its briefs and before the court, moreover, that Prudential is not seeking a remedy for the effect such nondisclosure had on this court so much as for the effect such non-disclosure had upon its own neglect of its responsibilities in the *Prince George Center* case. In light of the limited effect that such lack of notice had on the instant case's management and given Prudential's parallel duty of disclosure, this court does not find that Gypsum is estopped from raising the issue of *res judicata* on the grounds of this purported violation.

With respect to Gypsum's alleged stipulation to try claims related to 18 buildings and its allegedly misleading interrogato-

ries, Prudential raised these claims in the *Prince George Center* litigation, but the Pennsylvania court did not clearly decide these issues.[4] Therefore this court will consider these claims on their merits.

■ This court does not agree that in entering the March 1996 pretrial order, Gypsum stipulated to try all 18 buildings in this action; nor does it find that Gypsum's answers to Prudential's interrogatories were misleading. Prudential bases its claim that Gypsum stipulated to the trial of 18 buildings in this action on two paragraphs of the March 1996 pretrial scheduling order, specifically, a paragraph indicating that the remaining claims in the litigation are related to 18 properties and a paragraph indicating that a date for a comprehensive trial addressing all issues relating to all 18 properties would be set on December 2, 1996. These paragraphs constitute neither a stipulation nor a waiver of Gypsum's rights.

■ As Gypsum points out, waiver is a "voluntary relinquishment of a known right evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." *Country Chevrolet, Inc. v. Twp. of North Brunswick Planning Bd.*, 190 N.J.Super. 376, 380, 463 A.2d 960 (App.Div.1983). In this case, no "clear, unequivocal and decisive act" is present in this case. The language of the March 1996 scheduling order cannot plausibly be read to reflect a "voluntary

and deliberate" decision by Gypsum to forgo the pursuit of valid defenses to the claims against it. Instead, it establishes a schedule and the parties' current understanding of the remaining claims in the case. As this court discussed above, Gypsum did not know at the time it signed the March 1996 pretrial scheduling order whether Prudential would opt out of the trial class. This court declines to find that Gypsum should have anticipated Prudential's actions and committed itself to a litigation strategy, never mind that a scheduling order would memorialize such a commitment.

■ Likewise, Prudential's assertion that Grace or Gypsum made affirmative misrepresentations in their interrogatory answers itself misrepresents the inaccuracy of Grace's and Gypsum's responses. Prudential's Interrogatory 20 asked that defendants:

(a) Identify every litigation in which a party has alleged that asbestos containing material designated, manufactured, distributed or sold by your company was or is creating a unsafe or hazardous or potentially hazardous condition in a building.

(b) for each lawsuit, set forth

(i) the full caption, jurisdiction and docket number of the litigation in which the allegation was made;

(ii) attorneys of record for the party making the allegation;

---

4. The Pennsylvania court considered evidence also presented to this court relating to the defendant's signing of the Pretrial order and the allegedly false interrogatory requests. *See* Donovan, Ex. C, E, F, & G. Gypsum cites the following portion of the Court of Common Plea's decision as decisive of these issues: "As state at the beginning of this opinion this court had to determine if there were any 'circumstance' justifying the relief Pru seeks. The petitioner has cited many such 'circumstances.'" *Prince George Center*, 33

Phila.Co.Rptr. at 160, 1997 WL 1433730. The court held that "we believe that public policy, for reasons noted above, strongly favors the finality of judgments in class actions and that this court should do nothing having the potential to risk that finality." *Id.* at 175, 1997 WL 1433730. This statement is too broad for this court to conclude that the Pennsylvania court clearly decided the remaining issues before this court.

(iii) the date the allegation was first made;

(iv) whether you admitted or denied the allegation;

(v) the date you first admitted or denied the allegation;

(v) whether that admission of denial was ever modified, amended, or supplemented and if so, set forth the date of each modifications, amendment or supplement and the details with respect thereto.

Plaintiff's Supporting Appendix Concerning the Prince George Motion, Vol. III, 515–516. Grace responded with a standard objection as well the required list, which included the *Prince George Center* case by name, court and docket number. Grace's objection was worded as follows:

Grace supplements its response as follows: Grace objects to this request on the grounds that it is overly broad and burdensome and seeks information not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, its enumerated objection and all previously asserted objections, Grace attaches a list … of lawsuits brought by property owners stemming from the alleged installation of Grace's asbestos-containing materials in their buildings.

*Id.* at 516. In its brief, Prudential makes the following representation as to the above quote:

In a certified answer to Interrogatory No. 20 in this New Jersey Action, defendant Grace stated that the Prince George Action was "not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence." That sworn statement was clear and unequivocal. Grace not only represented under

oath that all such actions, including Prince George, were "not relevant" to this New Jersey Action, but Grace also represented that any information about Prince George was "not reasonably calculated to lead to the discovery of admissible evidence."

Prudential's First Brief in Opposition to Defendants' Motions for Partial Summary Judgment Based on the Prince George Judgment at 32. Prudential's brief clearly distorts Grace's response to Interrogatory 20. Grace made no specific representations as to the *Prince George Center* action, but only as to the breadth of the Interrogatory itself. Prudential's claims of material misrepresentation are clearly unfounded, and, given that the response to this question elicited approximately 390 asbestos-property damage actions asserted against Grace, any obscuring of the *Prince George Center* action is better attributed to the breadth of Prudential's interrogatory than to Grace's response.

■ Prudential also contends that Gypsum worked a deception by continuing to list the *Prince George Center* action under its original caption of *"Peter Kalkus v. U.S. Gypsum,"* when the lead plaintiff in that action was changed to *Prince George Center*. Under the Philadelphia Common Pleas docketing system, however, the case continued to carry this caption together with its same docket number for some substantial period after the substitution of Prince George Center as lead plaintiff. *See* Donovan Aff't., Ex. B. Even if the caption became outdated, the court does not find this evidence that a deception was worked upon Prudential to a degree that would justify estoppel.

■ Prudential further claims that in representing U.S. Gypsum in the *Prince George Center* action without notifying Prudential of its representation, MLB

breached both its disclosure agreement with Prudential and RPC 1.7, which requires that attorneys reveal any concurrent adverse representations to their clients. While MLB advised Prudential executives of its representation of U.S. Gypsum in general and of the existence of the Newark action pending in this court in particular, Prudential contends that MLB had a further obligation to notify Prudential of individual actions that could potentially pose a conflict. Gypsum's response to Prudential's claim includes the argument that Prudential's claim is barred by Pennsylvania preclusion law, and this court agrees.

According to Gypsum's expert witness, Professor Geoffrey C. Hazard, Jr., "having failed to raise the alleged conflict presented by MLB's representation of U.S. Gypsum in the *Prince George* case to the *Prince George* court, Prudential has no right to make a collateral attack on the validity of the judgment in the Prince George case based on that alleged conflict." *See* Second Supplemental Declaration of Professor Geoffrey C. Hazard, Jr., U.S. Gypsum's Appendix Containing Certifications in Further Support of Its Motion for Partial Summary Judgment Based on the *Prince George* Judgment, Ex. 1 at 9.

■ The Supreme Court of Pennsylvania has held that "It is hornbook law that the final determination by a court of competent jurisdiction settles not only the defenses actually raised, but also those that might have been raised." *Duquesne Light Co. v. Pittsburgh Railways Co.*, 413 Pa. 1, 194 A.2d 319, 321 (1963). If a litigant was party to a previous action in which the issue could have been raised and been finally determined, that litigant may not "remain quiet and raise it in a subsequent suit." *Federal Land Bank of Baltimore v. Putnam*, 350 Pa. 533, 39 A.2d 586 (1944). *See Winpenny v. Winpenny*, 434 Pa.Super.

348, 643 A.2d 677, 679 ("A party must raise all matters related to an issue or be forever barred from raising them again."); *See also Fox v. Gabler*, 534 Pa. 185, 626 A.2d 1141, 1144 (1993).

Certifications filed on November 26, 1996 with the Court of Common Pleas in the *Prince George Center* action demonstrate that Prudential was aware of MLB's representation of Gypsum in the Pennsylvania proceedings. *See* Certification of Stephen Gillers and Declaration of Professor Bruce A. Green, Certification of Kevin Donovan in support of U.S. Gypsum's motion for partial summary judgment, Ex. E. Indeed, in that action, in which Prudential sought permission to opt out of the class late, Prudential charged MLB with violation of RPC 3.3 on the grounds that MLB failed to disclose the existence of the Pennsylvania action to the New Jersey court. The existence of any impropriety arising from MLB's failure to report its representation of Gypsum in the *Prince George Center* action could have been litigated and would have been subject to final judgment in that action. Therefore, this issue is *res judicata* and may not be decided by this court.

### D. Whether Eight Buildings Fall within the *Prince George Center Class*

■ According to Rule 8(c) of the Federal Rules of Civil Procedure, *res judicata* is an affirmative defense; therefore, Gypsum bears the burden of proof in asserting this defense. In order to demonstrate that Prudential's claims as to eight of the eighteen buildings are *res judicata*, Gypsum must show that the eight buildings fall within the *Prince George Center* class. The *Prince George Center* class includes buildings of which (1) Prudential was the owner (2) at the time space in the building was leased (3) to the United States or an agency thereof. The plaintiff has argued,

in response, that Gypsum has not met its burden of proof and that the defendant's claims fail for one or more of four reasons: because Prudential did not own the buildings at any point during the requisite time period (May 30, 1984 through December 22, 1994); and/or because Gypsum's proofs do not account for the fact that the properties in question consist of more than one building; and/or because the buildings' tenants did not qualify as the U.S. government or a federal agency; and/or because Gypsum has failed to provide proper documentation of the leases to the federal government.

### 1. Twin Towers

Twin Towers, located in Atlanta, Georgia, is a property comprised of South Tower and Gaslight Tower. Prudential contends that it was only a member of a partnership which owned Twin Towers and was not the sole owner for purposes of the class; Prudential also argues that the government's lease of space in the South Tower began after Prudential sold the building and so the class settlement does not apply to the South Tower; finally, Prudential contends that the RTC is not a federal agency, and therefore the South Tower was not occupied by the federal government for class purposes.

As Gypsum points out, however, the South Tower and Gas Light Tower were owned by Twin Towers Joint Venture, in which Prudential held a partial ownership interest. The Final Order and Judgment in the Pennsylvania case, entered on July 23, 1996, dismissed "'Claims' ... which the Named plaintiffs and members of the Trial Class, and their ... past or present representatives, assigns, *subsidiaries*, divisions, affiliates, parents, *partners* .... had, now have or hereinafter may have against Remaining Defendants ..." (Defendant Grace's Reply Memorandum,

p4)(emphasis added). Therefore, the fact that Prudential owned the property in partnership with others does not remove it from the Trial Class. Moreover, Prudential was assigned the right to assert claims in this lawsuit on behalf of the partnership, and so it cannot claim that its interests are distinct from the partnership in the matter of the class action. Therefore, Prudential may be considered the "owner" of Twin Towers for purposes of the class definition.

■ Evidence submitted by the defendant demonstrates that Prudential held this partial ownership interest during the time that the IRS leased space in the Gaslight Towers; the defendant is unable to demonstrate, however, that the government leased space in the South Tower while Prudential held a partial ownership in the Twin Towers. *See* Nanos Affidavit, Exhibits M, N, O, P, & Q. The class definition encompasses "private owners of buildings ... who leased or subleased their buildings in whole or in part to the United States or any agency thereof," meaning that Prudential needed to own the buildings at the time the leases occurred; contrary to the defendant's assertions, class membership is not triggered simply because the government occupied the buildings within the time period. The defendant also points out that the plaintiffs' retention of all rights to bring claims for ACM costs in the buildings it had sold should result in the inclusion of Prudential in the class; however, the defendant does not present evidence demonstrating that the rights Prudential retained would permit Prudential to sue for claims arising from tenancies after it sold its interest in a given property.

■ As a result, Prudential's claims as to South Tower hinge on whether the South Tower is a separate building from the Gas Light Tower, as the plaintiff alleg-

es, or if the two towers are part of a single building.[5] If they are separate buildings, then the defendant has not satisfied the standard for summary judgment as to South Tower, as it has not presented sufficient evidence that the government leased space in the South Tower while Prudential owned that tower. If the two towers are part of the same building, then the defendant has met its burden on its motion for summary judgment, in light of the evidence it has presented the court demonstrating the presence of the IRS in the Gas Light Tower in the required period under the class.

As Grace makes clear in its brief, South and Gaslight Towers are only joined by a tunnel. In the proceedings in the *Prince George Center* action, including the definition of the settlement class, the term "building" is not defined in such a way that would encompass two towers that are part of the same complex, but are only joined by a tunnel. While the Twin Towers may be considered a single property, it is not a single building. Therefore, the court grants summary judgment dismissing Prudential's claims at to the Gaslight Tower, but declines to grant summary judgment dismissing Prudential's claims as to the South Tower.

### 2. Northland Towers

■ Northland Towers, located in Southfield, Michigan, is comprised of an East and West Tower, the Plaza building and a medical complex. Prudential currently has claims against U.S. Gypsum for the East and West Towers. The defendant has provided evidence that the Government Services Agency leased space in the West Tower during the time that Prudential owned Northland Towers. The defendant has not demonstrated government tenancy in the East Tower during this period. As with the Twin Towers, Prudential's claims as to the East Tower hinge on the factual issue of whether Northland Towers is or is not a single building. Unlike the Twin Towers, however, the East and West Towers share a common lobby, and may therefore be considered two towers belonging to the same building. Therefore, this court grants Gypsum's motion for summary judgment as to both towers of Northland Towers.

### 3. Five Penn Center

■ Prudential contends that Gypsum has failed to provide sufficient evidence of the government's tenancy in Five Penn Center, located in Philadelphia, Pennsylvania. Prudential asserts that the defendant should be put to the same proof as parties

---

5. The Court notes that Plaintiff's contention, that the Resolution Trust Company is not a federal agency for purposes of the class, is without merit.

Plaintiff argues that the trial class definition is narrower than the settlement class definition. Specifically, while the settlement class encompassed buildings leased by the "the federal government or an agency, department or unit thereof," (Court of Common Pleas, Amended Order, February 17, 1995, para 2) the trial class definition only included the "the United States or agency thereof." *Id.*, at para 4. The plaintiff argues that the omission of reference to "department or unit thereof" is significant and that, as a result, the Resolution Trust Corporation is not a government

tenant within the ambit of the class. This court finds that there are no disputed issues of fact with respect to the status of this government entity, only disputed questions of law which may be resolved by the court.

This court finds that the Resolution Trust Company is part of the United States government or an agency thereof. The RTC's enabling statute describes the RTC as an agency, as well as an instrumentality or government corporations. *See* 12 U.S.C. § 1441a(b). Moreover, Section 105 of Chapter 5 of the U.S.Code indicates that a government corporation is an agency. The Third Circuit has also described the RTC as a federal agency. *See RTC v. Nernberg*, 3 F.3d 62, 63 (3d Cir. 1993).

bringing claims under the class action settlement; that is, that Gypsum should be required to produce leases between Prudential and the required government entities documenting the entities' tenancy in the required period. *See* Plaintiff's Appendix, pp. 883–892. Gypsum is not, however, bringing claims under the settlement, but is only demonstrating that the plaintiff's claims fall within the settlement class.

Moreover, this court finds that Gypsum has provided substantial evidence of the occupancy of certain government entities within the periods defined by the class, sufficient to meet its burden of proof. Specifically, Gypsum provides a table with the start and end dates of Prudential's lease to the GSA and IRS, supplementing the lease copy which does not include the start date of the lease. These documents supply substantial proof of the government's tenancy during the period at issue. The plaintiff does not dispute the accuracy of the documentation submitted by Gypsum, or provide any evidence refuting the existence of the government leases in these buildings and therefore fails to demonstrate that the government's occupancy is a disputed issue of material fact. Therefore, this court grants Gypsum's motion for summary judgment as to Five Penn Center.

### 4. One Embarcadero Center

 Prudential asserts that its wholly-owned subsidiary, PIC Realty, and not Prudential itself, held an ownership interest in the partnership One Embarcadero Center Venture which owned One Embarcadero Center, located in San Francisco, California. As discussed above, however, the Final Order and Judgment in the Pennsylvania case, entered on July 23, 1996, dismissed " 'Claims' ... which the Named plaintiffs and members of the Trial Class, and their ... past or present representatives, assigns, *subsidiaries,* divisions,

affiliates, parents, *partners* .... had, now have or hereinafter may have against Remaining Defendants ..." (Defendant Grace's Reply Memorandum, p4)(emphasis added). Thus, although for some purposes, PIC Realty and Prudential have separate legal identities, for the purposes of their claims in this case, they may not distinguish their interests on the grounds that PIC is a subsidiary of Prudential, nor may PIC distinguish its interests from those of its partners in the One Embarcadero Center Venture, particularly since the other partners in the venture "assigned their rights to assert the claims in [the New Jersey] lawsuit to PIC Realty." Plaintiff's Second Brief in Opposition, p. 11.

Prudential also contends that the Postal Service is not a federal agency, and therefore space leased to the Postal Service is not encompassed by the Trial Class definition. This court finds, however, that the United States Postal Service is part of the United States government. While the United States Postal Service has been granted considerable autonomy for certain purposes, particularly to facilitate more competitive business practices, it remains part of the federal government. *See Baker v. Runyon,* 114 F.3d 668, 670–71 (7th Cir.1997) ("Congress may have vested the Postal Service with significant powers in order to increase its independence and autonomy, but it also provided that the Postal Service is part of the executive branch of government ....") [internal cites omitted]. In determining the degree of the Postal Service's autonomy, courts make clear that the Postal Service is nonetheless part of the United States government: "The [Postal Reorganization Act] abolished the Post Office Department, which, since 1789 had administered the Nation's mails, and replaced it with the United States Postal Service, an independent agency within the executive branch." *UPS Worldwide Forwarding, Inc. v. United*

*States Postal Service,* 66 F.3d 621, 625 [internal citations omitted]. *See also Coley Properties Corp. v. United States,* 219 Ct.Cl. 227, 593 F.2d 380 (1979); *Kieffer v. Vilk,* 8 F.Supp.2d 387, 392 (D.N.J.1998). As the trial class definition includes both the United States government and U.S. government agencies, the Postal Service clearly falls within the class definition. Therefore, this court grants Gypsum's motion for summary judgment as to One Embarcadero Center.

### 5. *Two Embarcadero Center*

As with One Embarcadero Center Prudential asserts that its wholly-owned subsidiary, PIC Realty, and not Prudential itself, held an ownership interest in the partnership Embarcadero Center Associates (hereinafter "ECA"), which in turn owned Two Embarcadero Center, also located in San Francisco, California. PIC Realty was assigned the rights to assert claims in this lawsuit by the other partners in ECA. Again, since the trial class definition encompasses both subsidiaries and partners, PIC Realty is the representative owner and its interests are identified with Prudential for purposes of this claim.

 Prudential also contends that the Defense Department is not a federal agency. It bases this claim on Chapter 5 of the United States Code, Section 305(a)(7), in which Congress explicitly excluded the Defense Department from the definition of government agencies. That section of the code, however, explicitly limits its non-agency designation "for the purposes of this section," a section which defines how included agencies will make systematic review of their operations. Other sections of Chapter 5 designate different sets of entities as non-agencies for the purposes of their sections, not including the Defense Department. *See, e.g.* 5 U.S.C. § 551(1)(a). Thus, it is not appropriate to generalize from section 305(a)(7) regarding the status of the Defense Department. Rather, this court relies upon the references in many federal courts to the Defense Department as a federal agency, accountable at law as an agency. *See, e.g., United States Department of Defense v. Federal Labor Relations Authority* 510 U.S. 487, 490, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994); *United States v. Scheffer,* 523 U.S. 303, 312, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1999).

 Further, Prudential argues that Grace must have provided the documentation required of a claimant in the *Prince George Center* action, that is, a signed lease, in order to establish that a government agency was a tenant of the building in this action. As Grace points out, however, as the owner of the building, Prudential has access to greater documentation than Grace with respect to the tenancies involved. For the purposes of this motion, documentation of the tenancies is sufficient absent some demonstration by Prudential that such tenancies did not exist. With respect to Two Embarcadero Center, Grace provides a response by plaintiff to Grace's interrogatory regarding whether "any tenant of Embarcadero Center One and Two ... has moved out ... due to the presence of ACM, and, if so, identify the tenant and the date on which that tenant gave notice of the move ...". Prudential responded to the interrogatory as follows: "In July 1990, the Department of Defense was unable to renew its lease due to a governmental directive prohibiting the leasing of office space in buildings which contain asbestos." Grace also submits a document which addresses "Documents executed since May 17, 1984–Two Embarcadero Center," which lists the Department of Defense under the subheading "Amendments" and indicates that the amendment was for a duration of 10

months and was "to add space." These documents provide evidence of the Department of Defense's tenancy in the requisite time period.

■ Finally, Prudential contends that Grace did not seek summary judgment as to Two Embarcadero Center until well after October 1, 1996, the deadline for all dispositive motions set by the court in its final scheduling order of March 22, 1996. It is within this court's discretion to modify the scheduling order, upon a showing of good cause. *See* Federal Rules of Civil Procedure, Rule 16(b); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1522.1. In this case, Prudential's failure to opt out of the Trial Class became final on September 13, 1996, well after the entry of the final scheduling order in March. The case was then put on hold while Prudential pursued its claims in the Pennsylvania courts, up to the United States Supreme Court. The amount of time that passed between when the *Prince George Center* settlement became final, solidifying Grace's claim, and the time the action was put on hold was negligible. Likewise, the final pretrial order was entered prior to any party's ability to know whether Prudential would opt out of the Trial Class and so did not contemplate discovery related to that issue. Moreover, Prudential has not made any showing of prejudice or lack of time to prepare a response to Grace's amendment to its original motion, entered within the required time period, claiming estoppel on the grounds of the settlement for seven buildings in this action. Therefore, this court will review Grace's motion as to Two Embarcadero Center, to the extent it impacts claims against Gypsum. This court grants Gypsum's motion for summary judgment as to Two Embarcadero Center.

### 6. Century Center IV

■ In contrast, Gypsum has failed to demonstrate that there is no disputed issue of material fact with respect to whether Prudential owned Century Center IV, located in Atlanta, Georgia, during the time the government leased space in the building. The only documents submitted by Gypsum register the presence of the government during periods after which Prudential had sold its interest in Century Center IV. *See* Nanos Affidavit, Exhibits M, N, O, P, & Q. The class definition encompasses "private owners of buildings . . . who leased or subleased their buildings in whole or in part to the United States or any agency thereof," meaning that Prudential needed to own the buildings at the time the leases occurred; contrary to Gypsum's assertions, class membership is not triggered simply because the government occupied the buildings within the time period. Gypsum also points out that Prudential's retention of all rights to bring claims for ACM costs in the buildings it had sold should result in the inclusion of Prudential in the class; however, Gypsum does not present evidence demonstrating that the rights Prudential retained would permit Prudential to sue for claims arising from tenancies after it sold its interest in a given property. As a result, this court will not dismiss Prudential's claims as to Century Center IV.

### 7. Prudential Plaza, Denver

■ Prudential also claims that Gypsum has failed to provide documentation that the IRS occupied the portion of the Prudential Plaza complex, located in Denver, Colorado, in which asbestos had been found. Prudential further contends that the portion of the complex to which Gypsum's documentation pertains was never part of the instant litigation. Gypsum, however, points to a memorandum of un-

derstanding which was expressly incorporated into the lease supplied by Gypsum, indicating that the government leased space in the portion of the building complex which Prudential included in this litigation, in the period of time delineated by the class settlement. *See* Nanos Aff, Ex. R. Therefore, this court grants Gypsum's motion for summary judgment as to Prudential Plaza.

### 8. Renaissance Tower

■■ Prudential asserts that while Gypsum has provided a number of documents relating to the EPA's tenancy at Renaissance Towers, located in Dallas, Texas, Gypsum has not provided a lease. This court finds, however, that the documents submitted by Gypsum, including rent rolls, a master tenant listing, and a Complaint filed by Prudential, establish that the EPA was a tenant in the requisite time period. *See* Nanos Affidavit, Ex. I, J, L. & Ex. F, p. 6,

■■ Plaintiff's second contention is that the trial class definition is narrower than the settlement class definition. Specifically, while the settlement class encompassed buildings leased by the "the federal government or an agency, department or unit thereof," (Court of Common Pleas, Amended Order, February 17, 1995, para 2) the trial class definition only included the "the United States or agency thereof." *Id.*, at para 4. The plaintiff argues that the omission of reference to "department or unit thereof" is significant and that, as a result, the Department of Treasury is not a government tenant within the ambit of the class. Prudential cites no legal support for its assertion that the Department of Treasury is not a federal agency. In contrast, federal courts regularly refer to the Department of the Treasury as a federal agency, and treat it as such under the law. *See, e.g., United States v. Ratner,*

464 F.2d 101, 103 (9th Cir.1972); *Mirza v. Department of the Treasury,* 17 F.Supp.2d 759 (N.D.Ill.1998). This court also does not find, as the plaintiff asserts, that the signature of the Comptroller of the currency of the Treasury Department rather than the United States Government on the lease signifies that the Treasury Department is not a federal agency or part of the United States government. Therefore, this court grants Gypsum's motion for summary judgment as to Renaissance Tower.

In conclusion, this court finds that there exists no substantial issue of material fact as to whether the Gaslight Tower of Twin Towers; Northland Towers; Five Penn Center; One Embarcadero Center; Two Embarcadero Center; Prudential Plaza, Denver; or Renaissance Tower fall with in the *Prince George Center* class such that the moving party Gypsum is entitled to judgment as a matter of law dismissing Prudential's claims as to those buildings. Gypsum has not provided evidence sufficient to demonstrate that the South Tower of the Twin Towers or Century Center IV fall within the *Prince George Center* class. Therefore, this court grants Gypsum's motion for summary judgment as to the Gaslight Tower of Twin Towers; Northland Towers; Five Penn Center; One Embarcadero Center; Two Embarcadero Center; Prudential Plaza, Denver; and Renaissance Tower, but denies that motion as to the South Tower of the Twin Towers and Century Center IV.

### III. Statute of Limitations

#### A. The Legal Standard

##### 1. The RICO Statute of Limitations

When it originally enacted RICO, Congress did not include a statute of limitations for civil RICO claims. In 1987, the United States Supreme Court held that the Clayton Act's four-year statute of limi-

tations period applies to civil RICO actions. *See Agency Holding Corp. v. Malley–Duff and Associates,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (hereinafter *Malley–Duff* ). The *Malley–Duff* Court did not, however, define when RICO actions accrued.

The Third Circuit has subsequently attempted to fashion a standard for accrual. Immediately following the *Malley–Duff* decision, the Third Circuit held that a claim accrued when the plaintiff discovered its injury, with the exception that if the defendant committed subsequent predicate acts, the plaintiff's cause of action would accrue on the date of the last predicate act. *See Keystone Insurance Co. v. Houghton,* 863 F.2d 1125 (3d Cir.1988). The Supreme Court, however, rejected the "last predicate act" standard in *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 187, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). The Third Circuit then adopted the injury and pattern discovery rule, requiring that the plaintiff should know that each element of a RICO claim existed, "namely, that he was injured, that the defendant was the source of this injury, and that a pattern of activity prohibited by RICO caused this harm." *Annulli v. Panikkar,* 200 F.3d 189, 192 (3rd Cir.1999). Again, the Supreme Court rejected the "pattern discovery" portion of this rule; however, the Court did not identify an appropriate accrual rule. *See Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 1079, 145 L.Ed.2d 1047 (2000).

In light of the *Rotella* decision, the Third Circuit has adopted an injury discovery rule to determine when a civil claim accrues under RICO. *See Forbes v. Eagleson,* 228 F.3d 471 (2000). According to the Third Circuit, "[u]nder the injury discovery rule, we must determine when the plaintiffs knew or should have known of their injury," *Id.* at 484. Plaintiffs must

also know of the source of their injury. *Id.* at 487 [citations omitted].

In *Rotella,* the Supreme Court observed that the federal statutes of limitations are generally subject to equitable tolling. *See Rotella,* 120 S.Ct. at 1084. According to the Third Circuit, if the defendant actively misled the plaintiff, the statute of limitations is tolled until the plaintiff's cause of action became or should have become apparent to a "person in the plaintiff's position with reasonably prudent regard for his or her rights." *Forbes,* 228 F.3d at 486. The Third Circuit has distinguished the discovery rule and doctrine of equitable tolling in the following manner:

> The two doctrines differ ... with respect to the type of knowledge or cognizance that triggers their respective applications. The discovery rule keys on a plaintiff's cognizance, or imputed cognizance, of actual injury. Equitable tolling, on the other hand, keys on a plaintiff's cognizance, or imputed cognizance, of the facts supporting the plaintiff's cause of action.

*Forbes,* 228 F.3d at 486, quoting *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1390 (3d Cir.1994).

*2. Summary Judgment*

In 1993, when resolving a summary judgment motion brought by Prudential to estop Grace and Gypsum from bringing their statute of limitations claims, this court first considered the issue of when Prudential knew or should have known of its injury. The court denied Prudential summary judgment on the grounds that Grace and Gypsum had demonstrated that a substantial issue of material fact existed as to whether the plaintiff should have known of its injury. *See Prudential Insurance Co. of America v. United States Gypsum Co.,* 828 F.Supp. 287 (D.N.J. 1993). In 1994, Grace and Gypsum

brought a motion for summary judgment on the plaintiff's RICO claim, on the grounds that the statute of limitations precluded the plaintiff's claim. Based on its 1993 decision that a triable issue of fact existed as to whether Prudential should have known of its injuries, the court reserved the issue of what Prudential should have known for trial. The court then denied Grace and Gypsum's motion on the grounds that they had not demonstrated the absence of a dispute of material fact as to what the plaintiff *knew*. *See Prudential Insurance Co. of America v. United States Gypsum Co.*, No. 87–4227, slip. op. (D.N.J. June 9, 1994).

The court now finds, however, that in its 1994 opinion, it should not have reserved the issue of what Prudential should have known for trial. While Prudential's 1993 motion for summary judgment raised the issue of whether Grace and Gypsum could provide evidence sufficient to show that Prudential should have known of its injuries, Grace and Gypsum's 1994 motion for summary judgment asked a different question: whether Prudential could provide evidence sufficient to *refute* the claim that it should have known of its injuries. This court has not addressed the later question and will do so now.

### B. Defining Prudential's Injury

Gypsum argues that Prudential's injury accrued when it became aware of the potential hazards of asbestos. Thus, according to Gypsum, the statute of limitations should begin to run from when Prudential first knew or should have known of such potential for injury, which was well before October 20, 1983. In response, Prudential urges that its injury is not the possibility of contamination, but actual contamination and the money it spent to abate the asbestos in its buildings: "Prudential is not claiming injury from knowledge that ACM poses potential health hazards .... rather, Prudential is claiming injury because in and after 1984 it had to spend hundreds of millions of dollars to deal with the hazards posed by ACM in its buildings." Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Dismiss Plaintiffs' RICO Claim Based on the Four–Year Limitations Period, at 17.

In cases in which a plaintiff brings a general claim for damages from asbestos, many courts find that the asbestos must pose a hazard, for instance, by having contaminated the building, before a claim accrues. *See City of Wichita, Kan. v. U.S. Gypsum, Co.*, 72 F.3d 1491 (10th Cir.1996); *MDU Resources Group v. W.R. Grace & Co.*, 14 F.3d 1274, 1279 (8th Cir.1994). *But see Roseville Plaza Ltd. Partnership v. U.S. Gypsum Co.* 31 F.3d 397, 400 (6th Cir.1994) (holding knowledge of presence of asbestos enough to put plaintiff on notice of possible contamination).

Despite Prudential's assertion in its reply to Gypsum's motion that its injury is only for contamination, Prudential's complaint explicitly seeks damages for potential as well as actual contamination:

Because of the contamination caused by the asbestos-containing materials in plaintiffs' buildings, plaintiffs have paid and will continue to pay substantial costs and fees relating to abatement and buildings monitoring actions, buildings survey and testing costs, tenant relocation costs, operations and maintenance program costs for asbestos-containing materials before their removal from buildings, substantial disruption to their business, substantial property damage to their property ... and other costs associated with the *contamination or potential contamination* of the buildings.

Prudential's Amended Complaint, ¶ 30 [emphasis added].

There is no need, therefore, to apply standards which pinpoint the date of a plaintiff's injury in a general claim for asbestos damages; the plaintiff has already specified its injury in its complaint. Prudential did not wait for indications that each of its properties was contaminated to bring its suit against Gypsum, but instead brought a claim for potential contamination as well as actual contamination.[6] As a result, Prudential's injury accrued when Prudential knew or should have known of the potential for asbestos contamination in its buildings.

### C. When Prudential's Injury Accrued

Gypsum contends that Prudential should have been alerted to any potential injury from the presence of ACM in the 1970's and early 1980's. In support of its argument, Gypsum cites EPA regulations and documents issued in the 1970's and early 1980's describing the potential hazards of asbestos; internal investigations by Prudential into the existence of asbestos in its buildings; and studies performed by Prudential in response to tenant complaints. Prudential responds that it did not know of the EPA documents and that the results of its investigations, whether internal or in response to tenant complaints, showed that the air in its buildings did not contain hazardous levels of asbestos fibers. Instead, Prudential identifies two events as significant to its discovery of its injury: its 1984 abatement of asbestos in conjunction with its demolition of the Chubb Building and testing performed by experts on its holdings in 1985 and 1986.

The court does not find that the two events identified by Prudential reasonably served as sources of new information for Prudential in identifying the existence of its injuries. The EPA had issued the regulations requiring asbestos encapsulation during demolition a decade earlier, and one of Prudential's engineers had brought the regulations to Prudential's attention by at least as early as 1981. The testing which Prudential performed in 1985 and 1986 was in response to the demolition and could have been performed at an earlier juncture had Prudential chosen to inform itself of the hazards it faced. Therefore, the court must determine which other events served or should have served to trigger Prudential's awareness of its claim. To this end, the events cited by Gypsum, including the EPA publications and regulations of asbestos and Prudential's own testing, are, or should have been more compelling triggers.

Prudential, however, has presented evidence that it did not have knowledge of EPA regulations and various media releases documenting the hazards of asbestos. Prudential has also presented evidence that it conducted testing of its buildings which showed that the air in those buildings was not contaminated and the asbestos in the buildings posed, as one testor put it, no "immediate" hazard to their occupants. In its 1994 opinion, this court substantially addressed the issue of whether the statute of limitations prevented Prudential from recovering damages for injuries of which it had actual knowledge. The court found that a dispute of material facts existed as to Prudential's actual

---

**6.** While the Plaintiff would not have standing to bring suit for a prospective injury, in this case, the court finds that the plaintiff's potential injury from asbestos is in fact an actual liability: at the very least, Prudential must take extra precautions when renovating or demolishing a holding which contains asbestos; it must monitor the air quality in its buildings and address tenant concerns regarding the presence of asbestos; and, because of these responsibilities, it should account for the presence of asbestos in the valuation of its properties.

knowledge, and therefore denied the defendants in that action summary judgment. The court will assume, *arguendo*, that Gypsum has not submitted any evidence in this motion which causes the court to overrule its 1984 opinion regarding Prudential's actual knowledge.

Prudential's showing regarding its actual knowledge falls far short, however, of demonstrating why Prudential remained unaware of the potential hazard asbestos posed in its holdings. While the court may accept for the purposes of this motion that Prudential was not aware of the EPA's repeated warnings about the potential hazards of in-place asbestos, the court nevertheless concludes that such events should have triggered Prudential's inquiry into the hazards posed by asbestos. Even if all of the EPA's attention was not directed to the niche of the building industry occupied by Prudential, a reasonably prudent building owner, and particularly one with investments as extensive as Prudential's, would have monitored the issue. Moreover, Prudential's own tenants repeatedly voiced their concerns to Prudential about the hazards of asbestos. While the testors hired by Prudential reported that the asbestos was not an immediate hazard, they noted that asbestos required continual monitoring since it could become hazardous if it is disturbed or deteriorates.

Prudential asserts that Gypsum is estopped from bringing its claims because Gypsum misled Prudential about the likelihood that asbestos would deteriorate. Prudential's claim would carry weight if Gypsum served as the only source of information about the friability of in-place asbestos. Gypsum demonstrates, however, that information on such friability was widely available. Most importantly, Prudential itself had found that asbestos in one of its own buildings had deteriorated and therefore was on notice that asbestos

in any of its holdings could also deteriorate and thus posed a potential hazard.

### 1. Events Prudential Claims Triggered Its Awareness

According to Prudential, the watershed event in its awareness of its injury was its 1984 abatement of asbestos prior to its demolition of the Chubb Building:

> In 1984, Prudential began to develop an appreciation of some of the potential hazards of ACM in buildings because it had to remove the ACM from a building it was demolishing. In November 1983, Prudential decided to demolish the Chubb Building in Short Hills, New Jersey. ACM was discovered and Prudential employees were informed by outside consultants that government regulations required that the ACM would have to be removed prior to demolition. Consequently, in 1984, the ACM from the Chubb building was removed at a cost of approximately $1,000,000. Following the removal of ACM at the Chubb Building, in late 1984 Prudential set up a task force to investigate the issue of in place ACM.

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Dismiss Plaintiffs' RICO Claim Based on the Four–Year Limitations Period, p7.

Prudential's brief in opposition to Gypsum's motion for summary judgment implies that Prudential only discovered its responsibility under governmental regulations in 1984, when provided with information about those regulations by outside consultants. Gypsum shows, however, that the responsibility for abatement as a result of demolition or renovations was established by EPA regulation in 1973 and 1975, and that subsequent studies by Prudential employees provided Prudential with knowledge of these regulations and

the presence of asbestos in Prudential buildings.

Gypsum demonstrates that in April 1973, the United States Environmental Protection Agency ("EPA") issued the National Emission Standard for Hazardous Air Pollutants (Asbestos, Beryllium, and Mercury) ("NESHAPS"), 40 C.F.R. § 61.20–24. This standard applied to "demolition by an owner or operator of a demolition operation who intends to demolish any institutional, commercial or industrial building (including apartment buildings having more than four dwelling units ) . . . . which is insulated or fireproofed with friable asbestos material." In 1975, § 61.22 was amended to include "demolition or renovation." 40 CFR § 61.22. Prudential responds that these regulations only applied to industrial uses of asbestos; however, the plain language of the regulations indicate that they encompass "demolition and renovation activities" of "any . . . commercial . . . building."

As Prudential acknowledges in its Amended Counterstatement and Response to Defendant's Rule 56.1 Statement ("Plaintiff's Amended Counterstatement"), Arcadius Zielinski, an architect in Prudential's Corporate Services & Buildings Department, was aware of these regulations and informed Prudential's executives of them at least as early as 1981. Plaintiff's Amended Counterstatement at p. 24. Mr. Zielinski wrote memoranda in May of 1981 to the Vice President of Prudential's Corporate Services and Buildings Department, in July of 1981 to the Vice President of Real Estate Operations in the Real Estate Investment Department, and in May of 1981 to the Vice President of Administrative Services of the North Central Home Office "in order to monitor compliance with any applicable OSHA or EPA regulations." According to Plaintiff's Amended Counterstatement, [Zielinski] wrote the

memoranda by looking at the specifications on file in Newark to see whether "asbestos was specified. . . . He summarized regulations that would have applied if Prudential had undertaken removal." *Id.* at pp. 23–24.

In these memoranda, Mr. Zielinski repeatedly asserted the following explanation of Prudential's responsibilities for asbestos abatement:

> Whenever alteration work is contemplated, a review should be made to determine whether asbestos bearing materials will be disturbed. If that should be the case, the documents issued for bidding should identify the material and the documents should advise the bidders that the asbestos bearing material shall be removed and disposed of in accordance with regulations of the United States Environmental Protection Agency.

Affidavit of Christopher W. Nanos in Support of W.R. Grace's Motion for Summary Judgment to Dismiss Plaintiffs' RICO Claim as Barred by the Four–Year Limitations Period ("Nanos Aff't"), Ex. 19. Thus, Plaintiff's Amended Counterstatement contradicts its own brief by admitting Prudential knew of the EPA regulations at least as early as 1981, based on an inquiry performed by its own employee. Moreover, Mr. Zielinski's reports demonstrate that Prudential knew or should have known of the presence of ACM in those holdings which he or any other Prudential employee investigated or should have investigated in light of the EPA's regulations on asbestos.

Prudential also claims that it confirmed its awareness of the contamination and potential contamination it suffered as a result of the presence of ACM when it received the results of a study it commissioned of its holdings in 1985 and 1986.

According to Plaintiff's Amended Counterstatement:

> When Prudential received the result of the survey of its properties for asbestos, it learned or confirmed that the eighteen buildings in this litigation had ACM. The information and advice Prudential received in connection with the survey of its properties in 1985 and 1986 caused it to appreciate that in-place ACM could potentially be hazardous even when not disturbed through demolition or when delaminating.... After 1985, Prudential began to incur hundreds of millions of dollars in property and other damages related to, among other things, (a) monitoring and operations costs, (b) abatement and removal costs, and, eventually, (c) loss as on the sale of buildings that contain asbestos.

Plaintiff's Amended Counterstatement, at pp. 7–10.

Prudential asserts that such testing triggered its awareness of the hazards of asbestos and therefore the running of the statute of limitations. Yet the timing of expert testing and the expenditure of funds for abatement is controlled by the plaintiff and is not directly tied to plaintiff's awareness of a hazard. As the Supreme Court of Ohio observed:

> [Plaintiff]'s contention that accrual should not occur until remediation begins or upon the expert determination that the condition is harmful is, in our view, unworkable. A test requiring expert determination or actual remediation before accrual would allow a plaintiff to stay the running of the statute of limitations until a time of its choosing, by simply refraining from investigation or refusing to take remedial measures.

*NCR Corp. v. U.S. Mineral Products Co.,* 72 Ohio St.3d 269, 649 N.E.2d 175, 177–78 (1995). The affidavit of David Holick, Jr., submitted to this court by Prudential as Exhibit 97 in support of Prudential's counterstatement and response, suggests that Prudential may have pursued such a policy of delay in order to avoid the publicity and liability that would attend public announcements and containment. Mr. Holick served as director of architecture at Prudential's real estate investment department in Houston, Texas from 1979 to 1984. According to the affidavit, Mr. Holick was "one of three trouble shooters responsible for overseeing the $11 billion real estate investment portfolio in Prudential's southern and western regions," including IBM's complaints about asbestos in the Jacksonville, Florida building. Holick Affidavit, at para. 2. Mr. Holick asserted that "[i]t was common knowledge among Prudential architects and engineers by 1979 that the presence of asbestos-containing materials in buildings constituted a potential health hazard to building occupants." *Id.,* at para. 4. Mr. Holick further contended that

> Prudential viewed its liability for asbestos in its buildings as a problem of great scope and magnitude. Due to the great expense that Prudential believed was required to alleviate the asbestos problem in its buildings, the alarm among tenants and unfavorable publicity that Prudential believed would result from immobilizing asbestos-containing materials present in its building, Prudential decided to keep the asbestos issue confidential.

*Id.* at para. 15. While the issue of what Prudential knew about the hazards of asbestos remains a disputed issue of fact, its clear interest in restricting the flow of information about the hazards of asbestos in its holdings could well have impacted its decision about when to conduct testing. Therefore, while its own testing may have contributed to its awareness of the hazards of asbestos, the timing of the testing is not

a reliable trigger for the running of the statute of limitations.

## 2. When Prudential should have known about the hazards of asbestos

While Prudential demonstrates that a dispute exists as to whether it actually knew of its injuries, it does not demonstrate that such a dispute exists as to whether it *should have* known of its injuries prior to October 11, 1983. In light of the existing EPA regulations banning the continued use of asbestos in any building construction, the guidelines issued by the EPA governing demolition and renovation, and Prudential's own monitoring of its properties, this court finds that Prudential should have known of its potential and actual injuries no later than 1981. Moreover, Prudential has acknowledged that it is one of the largest property and casualty insurance underwriters in the world, and also one of the largest real estate investors in North America, (*See* Prudential's Amended Complaint, para. 4) and therefore its liabilities are multiplied by the large numbers of its holdings. Given such exposure, prudence dictates that Prudential should have remained informed of its legal responsibilities.

### a. EPA Regulations and Publications

Between the years of 1978–1983, the EPA produced several reports on the hazards of asbestos, as well as regulations severely restricting the use of sprayed-on asbestos. Two reports from this era clarify that in-place asbestos is widely used for fireproofing and insulation, and that this asbestos can easily break down and become hazardous to the health of building occupants. Two other reports and a federal statute focus on schools, but the second of the reports expressly states that its findings apply to buildings that experience similar heavy traffic and high occupancy. While Prudential asserts that there is no evidence on the record clearly demonstrating that its executives read these publications, this court finds that these documents and the public controversy which they evince should have triggered Prudential's inquiry in the hazards of asbestos several years before it actually initiated its studies, in 1985.

As discussed above in Section III.B.1, the EPA placed regulations on the demolition and renovation of buildings containing asbestos materials in October 1975 and extended these regulations in June of 1978. Prudential contends that it only became aware of these regulations when it sought to demolish the Chubb building in 1984; however memoranda of Zielinski, also cited above, indicate that at least some senior executives at Prudential were informed of these regulations in 1981. As this court decided in 1994, evidence of Prudential's knowledge of these regulations is not evidence of Prudential's actual knowledge of the hazards of in-place asbestos. Just as Prudential argues, however, that the Chubb demolition alerted it to the EPA regulations and the potential hazards of asbestos in its other buildings, so the Zielinski memoranda on the existence of these regulations should have alerted Prudential potential hazards in its buildings.

The EPA focused next on the hazards of in-place asbestos in school and in buildings put to similar uses as schools. Two EPA documents aimed at asbestos management in schools were *Asbestos Containing Materials in School Buildings,* published in 1979 and *Asbestos Exposure Assessment in Buildings,* published in 1982. Likewise, in 1980, Congress enacted the Asbestos School Hazard Detection and Control Act, 20 U.S.C. §§ 3601–11, encouraging educational agencies to implement asbestos abatement programs. These documents and particularly the attendant legislation focused national attention on the hazards

of in-place asbestos. Prudential contends that it did not know of these documents and this legislation because it was not directed towards owners of commercial buildings. While the court will not evaluate the credibility of Prudential's statement for the purposes of this motion, it finds that a responsible building owner should have been aware of such dramatic steps regarding asbestos and should at least have considered how its holdings compared to schools before dismissing the information presented in those reports.

Gypsum produces one document without a date, which it asserts was released in April 1980. The document is entitled: "Toxic Information Series: Asbestos," and is intended to stimulate inquiry into asbestos monitoring. A box in the document indicates: "The [EPA's Asbestos Guidance] Package can help a building owner identify and eliminate asbestos hazards. It's available, free, by calling, toll free 800–424–9065." The document explains the potential hazards of in place asbestos quite clearly:

> [A]sbestos is widely used for fire-proofing and insulating homes and all kinds of public and private buildings.... Unless it is completely sealed into a product, as in asbestos floor tile, asbestos can easily break into a dust of tiny fibers. These fibers, much smaller and more buoyant than ordinary dust particles, float almost indefinitely in the air and can easily be inhaled or swallowed. Once the fibers enter the body, they can cause a number of serious diseases.... No safe limit or threshold of exposure is known. Any exposure to asbestos carries some risk to health, and people exposed to low levels of asbestos for a very brief period have later contracted mesothelioma.

Nanos Aff't, Ex. 9., pp. 1–2. The document also indicates that the EPA prohibited the spraying of all asbestos-containing materials in 1978. Prudential contends the document appears to focus on the schools and that Gypsum has not demonstrated that Prudential ever received the document. The document, however, explicitly states that it is "NOT for Schools Alone! ... Asbestos material have been used in the construction or renovation of ... commercial and residential buildings." Given the wide circulation of EPA documents and Prudential's position in the real estate market, Prudential should have taken notice of the publication; however, given the absence of a date on this document, the Court is unable to give this evidence substantial weight.

Prudential implies that because the EPA had not yet passed regulations addressing the hazards of in-place asbestos in commercial buildings, the EPA regulations of the 1970's were not relevant to its activities as a commercial building owner. Plaintiff's Amended Counterstatement, at p. 16. Yet the second EPA document, "Guidance for Controlling Friable Asbestos Containing Materials in Buildings," also know as the EPA "Blue Book," published in March, 1983, explicitly argues otherwise. It indicates that federal law does not mandate corrective action or set exposure standards, but asserts in its introduction that building owners are not thereby relieved of responsibility for monitoring asbestos in their buildings: "The potential for exposure to airborne asbestos in buildings and the associated risk of asbestos-related disease cannot be ignored. The decision whether or not to take action and the selection among alternative courses of action are the responsibility of the individual building owner." Blue Book, pviii, Nanos Aff't., Ex. 12. The Blue Book then outlines in detail the steps a building owner should take to survey its buildings, the ways its should analyze the results of the survey and methods for controlling asbestos.

Gypsum also points to a document used by the EPA for training in February 1983 indicating that while building owners might remain in denial about the potential hazards of asbestos, by that date, such owners should know of the hazards of asbestos:

A building owner might choose to believe there is no problem in his/her building, but, as we have seen, it is clearly prudent to find out the facts. With the rising public awareness of asbestos hazards, most any building owner would be hard pressed to justify no reasonable knowledge of the hazard.

Nanos Aff't, Ex. 13, at 3. Prudential contends that this document was used internally by the EPA and so Gypsum cannot prove that Prudential ever saw it. The document is significant, however, not for the information it provided to Prudential but for what it demonstrates about what a reasonably prudent building owner should have known at that time, specifically that asbestos was a potential hazard.

*b. Prudential's monitoring, internally generated and in response to tenants.*

Through the surveys of its architect, Zielinski, Prudential became aware of the presence of asbestos in its holdings and also of the conditions which could cause it to become hazardous. As a result of tenant complaints, Prudential also commissioned studies of the air quality and the condition of asbestos in several of its holdings. While these studies indicated that the air in these buildings was not contaminated, the testors informed Prudential of the limited durability of test results in light of the potential that asbestos could deteriorate. Moreover, in two of the buildings which Prudential examined, evidence of such deterioration already existed. As a result, Prudential should have been aware of the potential hazards of asbestos in its buildings long before it asserts it became aware of those hazards.

Zielinski examined the building specifications of Prudential's many holdings to determine which probably contained asbestos. He advised Prudential executives of the existence of the asbestos, regulations concerning its monitoring, and when asbestos was known to pose a hazard. For instance, as Prudential asserted in its Amended Counterstatement, in May of 1981 Zielinski informed the Vice President of Prudential's Corporate Services and Building Department that "as long as the asbestos was firm and in-place, it was not a hazard." Plaintiff's Amended Counterstatement at p. 24–25. Likewise, in July of 1982, Anthony Murphy, Vice President of Buildings in Prudential's Corporate Services and Buildings Department reported that "asbestos-bearing materials in good condition are not a concern." *Id.* at p. 26. Prudential goes on to argue that its personnel concluded from these reports that it "did not view the issue of asbestos in buildings as an issue that merited further attention." *Id.* at p. 26. A more prudent building owner should have concluded that it had a responsibility to ensure that its asbestos-bearing materials remained in good condition.

Prudential asserts that only tenant complaints brought in the late 1970's and early 1980's led it to investigate the condition of the asbestos and the air quality in some of its buildings. Prudential contends that these investigations were purely a matter of tenant relations, and that at no time did it suspect that the asbestos actually posed a hazard to building occupants. Gypsum demonstrates, however, that even if Prudential regarded the presence of asbestos in its buildings as a mere tenant relations issue, as such it was still a considerable liability and of great concern to Prudential. For instance, Prudential was very atten-

tive to IBM's objections to the presence of asbestos in Prudential's Jacksonville, Florida building, in which IBM was a tenant. Prudential did not want to lose IBM as a tenant over asbestos contamination: According to Prudential's Director of Real Estate Operations, "if IBM vacates because of asbestos contamination, the property would probably be unrentable for a period of time. Much like the Philadelphia hotel that had the outbreak of Legionnaires Disease." Nanos Aff't., Ex 58. Prudential also did not want to risk losing IBM as a tenant due to the potential of contamination. According to Prudential, "Earl Starr, of Prudential's Florida office, testified that he did not perceive the asbestos as a problem but that 'we were really concerned about how IBM was reacting to it.' As noted by Ronald Harmsen at that time: 'We want to retain IBM as a tenant, if at all possible.'" Plaintiff's Amended Counterstatement at p. 46 [citations omitted].

The testing consultants who evaluated the asbestos in Jacksonville also alerted Prudential to the need for on-going asbestos surveillance, because "[a]irborne concentrations of asbestos fibers may increase as the asbestos-containing fireproofing deteriorates through aging." Nanos Aff't, Ex. 61. Similarly, the inspector of the Kent Albert Building in Ottowa, Canada, which belonged to one of Prudential's wholly-owned subsidiaries, indicated in January, 1981 that the building's fireproofing contained asbestos and recommended that the fireproofing be reinspected every two to three years. Defendant's Counterstatement at 31. In such instances, Prudential claimed that because asbestos did not present an "immediate" hazard, and because it did not need to contain asbestos, it was not concerned about the potential hazards posed by asbestos. Prudential should have been aware, however, of the limited durability of any test results since the testers expressly informed Prudential of these limitations and the potential hazard posed by asbestos should its condition change.

According to Gypsum, in late 1980, at 5 Penn Center in Philadelphia, a tenant retained an industrial hygienist, who determined that the fireproofing coating the steel had "degraded to a point where material had dropped off and collected at floor level." In response, Prudential hired a company to remove "all accessible evidence of loose asbestos bulk, dust particles and debris" and to immobilize "[r]emaining intact accessible sprayed-on asbestos matrix" for a fee of $36,720. Prudential responds that it identified no apparent hazard in the building or in the loose asbestos material, but that it conducted encapsulation to "appease" its tenant. See Plaintiff's Amended Counterstatement, at 33–34. Nevertheless, this incident demonstrates that Prudential knew or should have known that asbestos in one of its buildings was already deteriorating and that responding to tenant concerns over the deterioration and the potential hazard of in-place asbestos was a considerable liability.

In March, 1981, results of tests commissioned by Prudential and performed on a building in which Prudential leased space in Wayne, New Jersey indicated that the insulation in the building contained high levels of asbestos. The tester was not concerned about the levels of asbestos in the building's air circulation system, but noted that the material located in areas accessible to maintenance workers was flaking off. According to the report, the condition of material containing asbestos in the ceiling void and plant room was as follows:

Material located on all structural beams and patches of deck in ceiling void

Material is flakey at edges where coverage stops and has a tendency to 'flap in the wind' when air is circulating.

Particles (clusters) have dropped onto the tops of air ducts and ceiling tiles.

Accessibility: can be reached by maintenance personnel electrical was easily. [sic]

Plant room had loose particles (groups or clusters) lying on A.H. unit and on floor where it had dropped from ceiling or been brushed off the exposed columns. Danger of possible transportation into office area by maintenance crews.

Floors of Plant room very dirty-exposure potential high!

*See* Prudential's Exhibit 65 in Support of its Counterstatement. While Prudential was a tenant, not an owner in this building, the report provided Prudential with another example of deteriorating ACM, raising its awareness of the potential hazards of in-place ACM in its own buildings.

Again, at its building in Boston, Massachusetts, Prudential was notified by two different tenants that fireproofing or insulation material in the tenant's space was disintegrating. In both instances, Prudential sent employees to speak with tenants, and those employees indicated in depositions that they "did not recollect" seeing asbestos deteriorating in either space; it is not clear from the depositions submitted by the parties whether the Prudential employees examined the spaces for deterioration. In response to a third tenant's complaint, Prudential discovered that in-place asbestos was deteriorating and causing an airborne hazard to building occupants. In a case it brought to recover damages from the manufacturer of asbestos used in the building, Prudential identified the date it became aware of its injury as July, 1983. Prudential claims that this discovery was not meaningful with respect to the present litigation because the asbestos used in Boston was of a different type; however, Prudential does not clarify how the difference affected the asbestos's disintegration rates, nor does Prudential demonstrate that it knew of the difference at the time, particularly given Prudential's stated policy of not concerning itself with the presence of asbestos in its holdings. A reasonably prudent building owner who has been notified of the disintegration of asbestos in three of its buildings would at least investigate its holdings and would recognize the potential hazard posed by even presently intact asbestos.

Thus, this court finds that while Prudential may not have known of its injury prior to its demolition of the Chubb building in 1984, it should have known of its injury prior to October 20, 1983. Prudential was aware of the hazards of ACM when released into the air, and should have been aware that in-place ACM could pose a hazard if it was disturbed or if it disintegrated. Prudential knew that ACM was deteriorating in two of its holdings: at 5 Penn Center in late 1980 and again at the Prudential Building in Boston in July of 1983. As a result, Prudential should have known that the ACM in its other buildings posed a potential hazard and that it would have to spend considerable amounts of money monitoring the material and potentially encapsulating or abating it if it should also begin to deteriorate, or if Prudential should renovate or demolish a holding. When it first discovered in 1980 that ACMs in one its properties had begun to deteriorate, Prudential should have launched an investigation into the condition of all the ACM in its buildings. By waiting until 1985, Prudential postponed its own understanding of its potential and actual liability, but it did not stop the running of the statute of limitations period. Prudential's assertions to the contrary are

not supported by evidence such that a jury could reasonably find for Prudential on its claim. As a result, this court grants Gypsum's motion for summary judgment on the grounds that the four-year statute of limitations had run before Prudential brought its claim in October of 1987.

### D. Estoppel

 Prudential claims that Gypsum should be equitably estopped from asserting a statute of limitations defense because Gypsum actively misled Prudential with respect to the hazards of inplace asbestos. In support of its claim, Prudential cites several documents purporting to show that Gypsum knew of the hazards of in-place asbestos and did not reveal that information to building owners. *See* Prudential's Brief in Opposition to Defendants' Motion for Summary Judgment to Dismiss Plaintiffs' RICO Claim Based on the Four–Year Limitations Period, at 5. Estoppel is only available to parties, however, if their injury has not become apparent or should not have become apparent to a "person in the plaintiff's position with reasonably prudent regard for his or her rights." *Forbes*, 228 F.3d at 485.

The documents cited by Prudential do not demonstrate that Gypsum could have succeeded in disguising Prudential's injury from Prudential, so long as Prudential had a "reasonably prudent regard" for its rights. Several of the documents may show that Gypsum knew and did not rush to publicize information it obtained in the 1940's, 50's and 60's that asbestos caused serious harm to human beings. By the time Prudential was considering the potential hazards of ACM, however, several independent and widely-publicized sources of this information existed, including the EPA regulations discussed above in Part C(2)(a).

In conclusion, based on reconsideration of record and facts before it, and in light of changes in the law regarding the accrual period under RICO, this court finds that statute of limitations period has run and Gypsum's motion to dismiss plaintiff's RICO claims must be granted. As a result, this court will not address Gypsum's motion for summary judgment dismissing Prudential's RICO claims on substantive grounds.

### IV. Supplemental Jurisdiction

Having dismissed the plaintiff's federal claims and finding no extraordinary circumstances, this court declines to exercise supplemental jurisdiction over the plaintiffs' state-law claims.

 According to § 1367(c)(1) of the United States Code, "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction." *See Hedges v. Musco*, 204 F.3d 109 (3d Cir.2000). The Third Circuit has held that, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995). This court finds that none of these considerations weigh in favor of retention of the plaintiff's remaining claims.

This court takes exception to Prudential's assertion that, having overseen the case for twelve years, this court "would not dare" remand it to state court. Parties initially brought this matter as a CERCLA claim, and after determining that this was an inappropriate characterization, the court allowed the plaintiff to recharacter-

ize its claims. The court has since handled this case expeditiously, in spite of the fact that fifty major office buildings were involved at its inception, and that expert testimony and massive discovery were necessary with respect to product identification in each building. Based upon Prudential's decision to reduce the number of building involved in the litigation, the court provided the parties with an expedited pretrial schedule and concluded pretrial of this case in 1996. This case was further delayed by one year of abortive efforts because the original counsel were disqualified and three years during which the Pennsylvania action was appealed to the U.S. Supreme Court. A writ of certiorari was denied by the Supreme Court in November, 1999, this court heard oral argument on the case in February of 2000, and the parties briefed their positions subsequent to oral argument. In November of 2000, Prudential sought a further delay in the proceedings because one of its counsel was extremely involved in the dispute of the national election in Florida.

In this case, Prudential is not prevented from filing a claim in state court. Therefore, the court finds that Prudential is not prejudiced by this court's dismissal of the case. The remaining claims, moreover, are all state law claims and are best left to that court to decide.