**MDU RESOURCES GROUP, doing business as Montana–Dakota Utilities Co., Inc., Appellant,**

v.

**W.R. GRACE AND COMPANY, and W.R. Grace and Company— Conn., Appellees.**

No. 92–2794.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 11, 1993.

Decided Jan. 27, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 24, 1994.*

* Bowman and Beam, Circuit Judges, would grant     the suggestion for rehearing en banc.

Daniel A. Speights, Hampton, SC, argued (Steven C. Lian, Minot, ND, and Jon M. Arnston, Fargo, ND, on the brief), for appellant.

Hugh V. Plunkett III, Minneapolis, MN, argued (John C. Childs and Allen W. Hinderaker, Minneapolis, MN, and Steven A. Storslee, Bismarck, ND, on the brief), for appellees.

Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

RICHARD S. ARNOLD, Chief Judge.

The appellant in this asbestos-removal case, MDU Resources Group, d/b/a Montana Dakota Utilities Co. (MDU), sued W.R. Grace & Co. (Grace) in 1990, two years after MDU learned that the Grace-manufactured fireproofing installed in its building in September of 1968 was releasing harmful asbestos fibers. After an eight-week trial, the jury returned a special verdict in favor of Grace on all of MDU's theories of liability. MDU now argues that several errors occurred at trial. First, MDU argues that the District Court used the wrong measuring point to determine when the statute of limitations began to run and, in so doing, misapplied North Dakota's discovery rule. Second, MDU argues that the District Court improperly excluded pieces of evidence MDU needed to establish key elements of its case-in-chief. Third, MDU argues that the District Court incorrectly instructed the jury on strict liability because it failed to instruct that state-of-the-art is no defense to a strict-liability claim. Finally, MDU argues that the District Court's permissive conduct towards Grace during the trial resulted in a proceeding that was fundamentally unfair. We agree with some of these contentions and now reverse.

## I.

Since the trial of this case was lengthy and complicated, we will present only the facts

and portions of the trial relevant to the issues presented in this appeal. In 1967 and 1968, MDU completed construction of its five-story general office building in Bismarck, North Dakota. In 1968, Monokote fireproofing, manufactured by Grace, was sprayed on the structural steel and decking of the building. The application was completed by September of that year. At the time of installation, Grace was aware that the Monokote fireproofing contained asbestos. MDU, however, was not aware of this fact until September of 1980, when Health Department tests revealed that the Monokote contained 15–25% asbestos. The Health Department report also stated that the asbestos was "apparently intact" and that there were "no employee overexposure hazards." Nonetheless, the Department recommended that MDU investigate carefully removing the material, because the Monokote eventually would begin to deteriorate and would then pose a health hazard. Although MDU received conflicting information from a subsequent test in 1985, the original test's results were corroborated in 1987, and both parties agree that MDU was aware of its asbestos problem as early as 1980.

MDU first learned that the asbestos in the Monokote was releasing fibers and contaminating its building in early 1988. A report from HTI Engineering showed that the building had been contaminated. Subsequent tests confirmed this and found an average of more than 78 billion asbestos fibers per square foot on horizontal surfaces below the fireproofing. This number of fibers created asbestos levels in the air from 490 to 110,000 times normal, meaning that the asbestos needed to be removed immediately to protect the health of MDU workers. MDU brought this suit in 1990 to obtain the costs of removal.

MDU sued under a number of different theories: negligence, strict liability, failure to warn, and breach of warranty. Grace mounted a two-fold defense. It argued first, that the statute of limitations had run on MDU's claims, and second, that MDU had suffered no harm from the asbestos Monokote. At trial, MDU argued that Grace was aware of the inherent dangers of asbestos, that Grace knew that Monokote contained asbestos, and that, prior to 1968, Grace had a readily-available alternative, Cellufloc.[1]

Grace told the jury in its opening statement that it took the asbestos out of Monokote in 1973, but claimed that a non-asbestos substitute was not available before 1968. Transcript (Tr.) 57, 3425–28. In order to prove that an alternative substance was available, MDU offered into evidence, among other things, a 1943 trademark for Cellufloc that tended to show that Cellufloc had been available before 1968. The District Court excluded this evidence because the trademark did not demonstrate the efficacy of the product. Tr. 2823.

MDU also sought to introduce a one-page document from Grace's insurance carrier to Grace's Safety Administrator entitled "Asbestosis." The document, plaintiff's exhibit P–83A, summarized a 1966 article published by the American Insurance Association on the relationship between asbestos exposure and cancer. P–83A discussed the health risks inherent in fitting, cutting, and removing asbestos materials in buildings. MDU offered the document at trial to show that Grace knew, before September 1968, that asbestos was harmful to human health. While recognizing that the summary was highly probative and relevant, the Court ultimately excluded P–83A on the grounds that an improper foundation had been laid. The Court concluded that MDU had not established that Grace received the document before September of 1968.[2]

In addition to the evidentiary issues, MDU also disputes the District Court's permissive treatment of Grace's cross-examination strategy. In pre-trial conference, MDU request-

---

1. Cellufloc is a paper and wood-pulp product that Grace ultimately used to replace the asbestos in Monokote in 1973.

2. We do not address MDU's third evidentiary claim—that the District Court improperly admitted into evidence an article from "Science" mag- azine. Any error from this admission may have been corrected by the District Court's permitting MDU to introduce its own articles in response. In any event, the District Court will have an opportunity to reassess the article's admissibility on remand.

ed that the District Court confine Grace's cross-examination of MDU's witnesses to the scope of direct. The District Court gave MDU that assurance. At trial, however, the Court allowed Grace to ask MDU's witnesses leading questions that were designed to establish Grace's statute-of-limitations defense. Although MDU objected to this practice, the Court continued to allow it. At one point, during MDU's case-in-chief, the Court prodded MDU to question its witness regarding Grace's statute-of-limitations defense. Tr. 2397. MDU also alleges that several other occurrences at trial tainted the proceedings with a fundamental unfairness.[3]

Finally, two of the Court's instructions to the jury are challenged. First, the District Court instructed the jury that in order to find in favor of Grace on its statute-of-limitations defense, it must find that MDU knew or with the exercise of reasonable care should have known

1. That the Monokote fireproofing installed in certain areas of MDU's General Office Building contained asbestos;

2. That the asbestos-containing Monokote in MDU's General Office Building might pose a hazard; and

3. That the defendants were possibly liable.

Jury Instruction Number 27. The District Court further instructed that Grace had to prove these elements by a preponderance of the evidence.

Second, before the Court gave its strict-liability instruction, MDU requested that the Court include an instruction that it is no defense to strict liability that the product was state-of-the-art. Because the District Court had told the jury that such evidence was a valid defense to a negligence claim,

MDU wanted the negative instruction included in the strict-liability instruction for clarity. Grace contended that MDU was not entitled to such an instruction. Although the District Court agreed that MDU's proposed language correctly stated North Dakota law, it declined to give the instruction. The jury returned a verdict in favor of Grace.

## II.

### A.

■■■ This Court will not reverse on the basis of jury instructions if they, "as a whole, adequately and sufficiently state the law applicable to the case." *Sterkel v. Fruehauf Corp.*, 975 F.2d 528, 531 (8th Cir.1992). We review the District Court's determinations of law *de novo*. Because the District Court's jury instructions on the statute of limitations failed to state the law adequately and sufficiently as to when discovery of asbestos triggers the running of the statute of limitations, we are unable to affirm this judgment for the defendant Grace on the basis of its limitations defense.

■■■ Under North Dakota law, the statute of limitations for a cause of action based on asbestos contamination is six years. N.D.Cent.Code § 28–01–16 (1991). To determine the point at which any statute of limitations begins to run, North Dakota applies the discovery rule. *Wall v. Lewis*, 366 N.W.2d 471, 473 (N.D.1985) (legal malpractice); *Iverson v. Lancaster*, 158 N.W.2d 507 (N.D.1968) (medical malpractice). Originally adopted for medical-malpractice claims, North Dakota applied this rule to asbestos cases in *Hebron Public School District No. 13 v. U.S. Gypsum Co.*, 475 N.W.2d 120, 126 (N.D.1991) (certified question answered): "a cause of

---

3. MDU alleges that the trial was fundamentally unfair because Grace was allowed to show a blow-up photograph of MDU's CEO while MDU was prevented from doing the same with Grace's CEO. Certainly, this type of demonstrative evidence is unnecessary on either side. Additionally, MDU argues that, during cross-examination, the District Court allowed Grace to present evidence as to MDU's size—to show MDU's knowledge of asbestos hazards—but prevented MDU from making reference to Grace's size. Grace's size is, of course, irrelevant to anything but punitive damages; by the same token, the relevancy

of MDU's size to this case is dubious at best. Finally, MDU argues that the Court improperly allowed Grace to discuss MDU's gravel pit, acquired one month before trial, which Grace claimed was an asbestos mine. At one point, the Court itself referred to this pit as an "asbestos mine." Regardless of whether this pit did or did not contain asbestos, it is irrelevant to the question of what MDU and Grace knew or did not know in 1968 (when the Monokote was installed) and 1980 (when MDU discovered the presence of asbestos)—the relevant dates for liability and statute-of-limitations purposes.

action, or claim for relief does not accrue until the aggrieved party discovers the facts which constitute the basis for its cause of action or claim for relief...."

Grace argues that *Hebron* stands for the proposition that discovery of the presence of asbestos equals discovery of the facts which constitute the basis for MDU's cause of action. Therefore, they argue, MDU knew of its cause of action in 1980 and filed its claim long after the statute of limitations had begun to run. MDU contends that, under North Dakota's economic-loss doctrine, it could not have brought suit until it could show its building had been "injured" by the asbestos; therefore, the "facts which constitute the basis for its cause of action" were not known until MDU discovered the asbestos contamination in 1988. The District Court instructed the jury based on Grace's theory of the statute of limitations.

█ Regardless of the plaintiff's knowledge of a potential cause of action, no cause of action exists until the plaintiff suffers some compensable harm. See *Wall v. Lewis, supra,* 366 N.W.2d at 473. *Hebron* does not stand for nearly so broad a principle as Grace suggests,[4] and a study of this Court's precedents in asbestos litigation and of North Dakota's economic-loss doctrine demonstrates that mere discovery of asbestos is insufficient to begin the running of the statute of limitations.

█ Before we can determine when the statute of limitations began to run on MDU's

claims, we must first determine when an asbestos plaintiff is injured and can bring suit. The issue of when injury occurs was implicitly decided in *Tioga Public School District # 15 v. U.S. Gypsum,* 984 F.2d 915 (8th Cir.1993). Although not a statute-of-limitations case, *Tioga* does address the point at which an asbestos plaintiff may be said to be injured under North Dakota law. In *Tioga,* the plaintiff school district discovered that the acoustical covering on the ceiling tiles contained asbestos and sued to recover abatement costs. The defendant argued that the school district had suffered only economic loss and could not recover. The *Tioga* Court concluded that, although the North Dakota Supreme Court had adopted the economic-loss doctrine,[5] it would be unlikely for it to hold that the doctrine barred recovery in asbestos cases. This Court stated, "The asserted injury here is not simply an injury to the [covering] or to the school buildings; rather, the injury is the *contamination* of the Tioga school buildings by asbestos and the consequent health risk to the building's occupants." *Id.* at 918 (emphasis supplied). The Court then cited several other jurisdictions that had similarly so held. See *City of Greenville v. W.R. Grace & Co.,* 827 F.2d 975 (4th Cir.1987) (injury at issue was contamination of Greenville's city hall, which endangered the health of the occupants); *Detroit Bd. of Educ. v. Celotex Corp.,* 196 Mich.App. 694, 703–04, 493 N.W.2d 513, 518 (1992) (because asbestos may contaminate a building, rendering it unfit for occupation, economic-

---

4. The issue in *Hebron* was whether the six-year period began to run when the asbestos was installed, 1963, or from when the asbestos was discovered to be present, 1983. Because the School District discovered that plaster in its building contained a dangerous level of asbestos and brought suit within three years of that discovery, it was well within the statute of limitations. Additionally, the tile in *Hebron* was friable and had begun to release harmful asbestos fibers into the air. *Hebron Public School District No. 13 v. U.S. Gypsum,* 690 F.Supp. 866, 870 (D.N.D. 1988). Therefore, the issue of whether the point of injury was discovery of the asbestos itself or the release of harmful fibers into the air was neither presented nor addressed either by this Court (see *Hebron Public School Dist. No. 13 v. U.S. Gypsum,* 953 F.2d 398 (8th Cir.1992)) or by the North Dakota Supreme Court (see *Hebron, supra,* 475 N.W.2d 120).

5. The premise behind the economic-loss doctrine is that tort law is the appropriate vehicle for recovery when a defective product causes personal injury or injury to property other than itself, but is not appropriate for use to reallocate the balance of the buyer/seller relationship. *Hagert v. Hatton Commodities, Inc.,* 350 N.W.2d 591, 594 (N.D.1984) (adopting the economic-loss doctrine as the rule in North Dakota and citing with approval *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965)). The allocation of purely economic loss, such as occurs when the product or a component part of the product destroys only the product itself, see *Cooperative Power Ass'n v. Westinghouse Electric Corp.,* 493 N.W.2d 661 (N.D.1992), is better handled through contract and warranty than tort. Thus, the economic-loss doctrine prevents recovery for losses that are not attributable to physical injury to persons or other property.

loss doctrine does not apply); *Board of Educ. v. A, C & S, Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 640–46, 546 N.E.2d 580, 585–91 (1989) (economic-loss doctrine does not bar recovery when the asbestos has contaminated the building, thereby damaging other property). All of these jurisdictions based their determinations, at least in part, on the fact that asbestos contamination presents a grave health risk. This leads to the conclusion that the injury for which asbestos plaintiffs are being recompensed is the contamination of their buildings and not the mere presence of asbestos.[6]

The *Tioga* Court drew support for its conclusion by distinguishing the only case to hold an asbestos claim barred by the economic-loss doctrine, *Adams–Arapahoe School District No. 28–J v. GAF Corp.*, 959 F.2d 868 (10th Cir.1992). The *Tioga* Court stated that *Tioga* differed from *Adams–Arapahoe* in an important respect: "in *Adams–Arapahoe* the school district did not show that there had been any release of asbestos from the asbestos-containing materials (nonfriable tiles) in its schools so as to result in the contamination of the schools." *Tioga*, *supra*, 984 F.2d at 919 (citing *Adams–Arapahoe*, 959 F.2d at 874). Since the Tioga School District had shown that the asbestos in its schools was friable and had released asbestos fibers into the air, its claim was not barred by the economic-loss doctrine. *Tioga*, *supra*, 984 F.2d at 919–20.

■ MDU alleges that its building was contaminated by the Monokote fireproofing because the Monokote was releasing harmful asbestos fibers. Indeed, under the criteria set forth in *Tioga*, had MDU brought its cause of action before its building was contaminated, its claim would have been barred by the economic-loss doctrine. *Cf. Cooperative Power Association v. Westinghouse Electric Corp.*, 493 N.W.2d 661, 663 n. 5 (N.D.1992) ("In the context of products liability cases, economic loss generally means pecuniary damage that occurs through loss of value or use of the goods sold or the cost of repair together with consequential lost profits *when there has been no claim of personal injury or damage to other property*," (emphasis added)).[7] Therefore, the District Court erred when it instructed that the issue for purposes of the statute of limitations was when MDU learned of the presence of asbestos in its building; instead, the proper question was when MDU could have learned, with the exercise of reasonable diligence, that its building had been contaminated by asbestos.[8] See *Froysland v. Altenburg*, 439 N.W.2d 797 (N.D.1989) (requiring diligence on the part of the plaintiff to discover his cause of action); *Tioga*, *supra*. It is at this point that North Dakota's six-year statute of limitations began to run. We hold that the jury was incorrectly instructed on this point, and so reverse its finding that the statute of limitations had expired.[9]

**6.** The District Court in *Hebron, supra*, and *Drayton Public School District No. 19 v. W.R. Grace*, 728 F.Supp. 1410 (D.N.D.1989), rejected the defendant's economic-loss argument on the basis that the building had been contaminated. See *Hebron, supra*, 690 F.Supp. at 870 ("However, it appears that the coating functioned satisfactorily in its intended role except that, Hebron alleges, it released harmful asbestos fibers into the building"); *Drayton, supra*, 728 F.Supp. at 1412–13 (quoting *Hebron* and saying that the Drayton School District's claim that the dangerous levels of asbestos in the ceiling plaster made the building hazardous to health meant the economic-loss doctrine did not apply).

**7.** In *Cooperative Power*, the plaintiff contended that if a product was unreasonably dangerous or defective, the economic-loss doctrine would not bar recovery for products that damage only themselves. Therefore, it is likely that the North Dakota Supreme Court would find that MDU had no cause of action until the asbestos Monokote injured something other than itself—in other words, until some amount of harm, either to the building or to the occupants, occurred.

**8.** The harm necessary to begin running the statute of limitations would certainly be manifest upon discovery of contamination, and possibly earlier. If, for example, MDU expanded or remodeled its building between May of 1980 and six years before filing suit, such remodeling could trigger abatement costs and would begin running the statute of limitations. Since the record does not demonstrate whether MDU renovated its building during the time period in question, we merely note this issue for purposes of the new trial.

**9.** Grace argued at trial not only that the statute of limitations had run, but also that the plaintiff had suffered no injury from the asbestos Monokote. The arguments are inconsistent: if MDU has suffered no injury from the Monokote, then it

### B.

We now address the other errors raised by MDU. The two most important are evidentiary in nature. First, MDU asserts that the District Court erred when it excluded the 1943 Cellufloc trademark. After presenting evidence that replacing the asbestos with a non-asbestos substitute, Cellufloc, was technologically feasible in the early 1970s, MDU attempted to show, by offering the 1943 trademark for Cellufloc, that the substitute was available before 1968. The Court excluded the trademark because the trademark itself did not show that the substance would be an adequate substitute for asbestos. This Court reviews the trial court's determination under the abuse-of-discretion standard. We will find abuse of discretion when the decision of the trial court is based on "an erroneous view of the law or a clearly erroneous assessment of the evidence." *Waible v. McDonald's Corp.*, 935 F.2d 924, 926 (8th Cir. 1991) (citations omitted).

We agree with the District Court that for Cellufloc to be a feasible replacement it must be both technically sufficient and economically viable. However, the Court's requirement that the trademark itself demonstrate its own effectiveness misses the point. Grace denied that a substitute even existed, regardless of feasibility. MDU offered the trademark to rebut this argument by showing availability. The trademark tended to show that a product with the same name as the one Grace ultimately used to replace asbestos existed in 1943, long before Monokote was installed in MDU's building. That the product bore the same name was not the only evidence offered by MDU. MDU also presented evidence to the effect that the 1943 Cellufloc, like the Cellufloc used by Grace, was a filler—in plastics and casings for steel arc-welding rods. Additionally, the Cellufloc ultimately used by Grace was a paper and wood-pulp product; the company receiving the trademark for Cellufloc was a timber and wood-pulp company. Taken together, this evidence is sufficient to establish the relevancy of the trademark, because the jury could infer that the two products were similar. This inference would not be unduly prejudicial to Grace. If the 1943 Cellufloc would not have been a feasible alternative to asbestos, if the earlier and later Celluflocs were completely different, or if Grace was unaware of the 1943 product's existence, Grace could introduce evidence to that effect.[10] In excluding this relevant evidence, the District Court misapprehended the purpose for which the trademark was offered. Its decision to exclude the trademark was therefore an abuse of discretion.

The Court's exclusion of this evidence was not harmless error. Without it, MDU was unable to refute Grace's assertion that Grace was unable to replace the asbestos before 1968. Tr. 3425–28. This becomes all the more important since Grace's own representative testified that reformulation and testing efforts aimed at producing Monokote without asbestos before 1968 would have been possible had a substitute been available. Tr. 2816–17. Furthermore, the 1943 trademark was not the only feasibility evidence excluded by the Trial Court. The Court also excluded documents provided by Grace to MDU that tended to show that Grace was aware of alternatives to asbestos before 1968. Tr. 2861–63, 2868–69. Had other evidence of alternative design been admitted, exclusion of the 1943 trademark might have been harmless. As it is, however, the exclusion was prejudicial and warrants reversal.[11]

---

has no cause of action—until an injury is suffered, the statute of limitations cannot begin to run.

**10.** The trademark was assigned in 1963 to the Georgia–Pacific Corporation, which renewed the trademark in 1966 and 1986.

**11.** Grace cites *Anderson v. Malloy*, 700 F.2d 1208 (8th Cir.1983), for the proposition that the District Court here did not commit reversible error. However, *Anderson* stands for precisely the opposite conclusion. In *Anderson*, to controvert the hotel-owner defendants' contention that effective security measures were not feasible at the time the plaintiff was raped, the plaintiffs wanted to present evidence that the owners had later installed peepholes and chain locks. The District Court excluded this evidence under rule 407 as evidence of subsequent remedial measures. This Court reversed, saying that "the trial court committed a prejudicial abuse of discretion when it excluded the evidence" because evidence that these devices were later installed went directly to the question of whether installing such devices

The second evidentiary ruling MDU challenges is the trial Court's decision not to admit plaintiff's exhibit P–83A. A summary of a 1966 article entitled "Asbestosis," P–83A was the last of five stapled pages. The pages had been given to Grace by its insurance carrier, and all but the last were dated 1967. MDU offered P–83A to demonstrate that Grace was aware of the dangers of asbestos before September of 1968. The District Court initially admitted this exhibit subject to foundation. Later, the Court determined that the document would not be admitted because an improper foundation had been laid and because it had hearsay concerns with the first paragraph. MDU redacted the first paragraph and resubmitted the exhibit. The Court then rejected the exhibit because MDU had failed to establish the date of its receipt by Grace.

Rule 104 of the Federal Rules of Evidence provides that preliminary questions of admissibility are to be determined by the Court subject to the requirements of subsection (b): "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed.R.Evid. 104(b). Once evidence sufficient to support the finding is introduced, it is then appropriate to allow the jury to determine whether the predicate fact is established. "If preliminary questions of conditional relevancy were determined solely by the judge, ... the functioning of the jury as a trier of fact would be greatly restricted and in some cases virtually destroyed." Fed.R.Evid. 104(b) Advisory Committee's Note.

When the District Court determined that MDU had failed to establish the date of receipt, it was, in effect, determining that a preliminary fact (when Grace received the document) had not been established. This was error. As a matter of law, MDU produced sufficient evidence to allow the jury to establish the date of receipt. First, when evidence is in the control of one party and not produced to the other, the factfinder may

infer that the evidence would establish what the other party proposes. In other words, the documents in question, which came out of a file folder, Folder K, were in the sole custody and control of Grace when they were produced. Since Grace did not provide MDU with the evidence necessary for it to establish date of receipt, such as the nature of the filing system Grace used, the factfinder could infer that any such evidence would establish that the document was received before September of 1968.

Second, the fact that the "Asbestosis" article was the fifth page of five pages stapled together raises an inference that the pages were received at the same time. It is too much to ask of the plaintiff to present specific proof that the last sheet was received before September of 1968. Finally, of a total 197 pages in File Folder K, all those that were dated have dates of 1968 or earlier. Each document in the folder located before P–83A is dated before September of 1968; moreover, 100 pages of the documents after P–83A are dated September of 1968 or before. Only four documents in the folder bear a date after September of 1968; all of them were located after P–83A in the folder, and three of them refer to work done in late 1968.

These facts are sufficient, as a matter of law, to support a finding that Grace received P–83A before September of 1968. Once the plaintiff established these facts, the District Court should have made a preliminary determination that facts sufficient to prove the relevancy of the document had been established. It should have then submitted the document to the jury with an instruction that, if it found that Grace received the document before September of 1968, the jury could consider it as evidence that Grace was aware of the hazards of asbestos before Monokote was installed in MDU's building. If the jury did not find that the document was received before September of 1968, then the document would be irrelevant to the question of liability. Grace can still argue that the document was not received before September of 1968, but any such argument would be for

---

was feasible. *Id.* at 1213–14. Similarly, the Cellufloc trademark goes to feasibility, providing evidence that substitute eventually used by Grace

in 1973 was available to it before September of 1968.

the jury to consider in determining whether P–83A's relevancy was established and would not alter the fact that MDU met Rule 104's requirements for admissibility.[12]

As with exclusion of the Cellufloc trademark, we cannot say the exclusion of P–83A was harmless. The District Court commented that the document was "a pretty critical piece of paper" if received by Grace before September of 1968 and stated that P–83A "establishes a level of knowledge of the existence of a problem" that "throw[s] a cloud on the position of W.R. Grace." Tr. 2422, 2440. The Court also remarked that the document had "some more relevance than substantially other instruments...." Tr. 2445. These comments show that P–83A was critical to MDU's case because it would have enabled MDU to establish the knowledge necessary to hold Grace liable on a failure-to-warn theory. Under the circumstances, excluding P–83A was prejudicial error.

▆▆▆▆ Many of the other errors alleged by MDU are mooted by this remand; however, a few comments by way of guidance would be helpful to the retrial of this case. First, although the scope of cross-examination is within the discretion of the trial court, Fed.R.Evid. 611,[13] it should not be allowed to get out of hand. When cross-examination goes beyond the scope of direct, as it did here, and is designed, as here, to establish an affirmative defense (that the statute of limitations had run), the examiner must be required to ask questions of non-hostile witnesses as if on direct. Fed.R.Evid. 611(c), Advisory Committee's Note.[14] In other words, Grace should not be permitted to ask leading questions in its attempt to establish its statute-of-limitations defense through

cross-examination of witnesses called by MDU in its case-in-chief, unless those witnesses' direct testimony bears significantly on the limitations issue, or unless Grace can sufficiently demonstrate that those witnesses are hostile. Second, we do not find reversible error in the Court's strict-liability instruction, and we agree that MDU is not necessarily entitled to an express instruction that state-of-the-art is no defense to strict liability. However, since this cause is to be remanded, we recommend that the District Court use the strict-liability instructions in *Spieker v. Westgo, Inc.*, 479 N.W.2d 837 (N.D.1992), as a model. Because the North Dakota Supreme Court held that these instructions were sufficient without a negative state-of-the-art instruction, using them as a model will insure that the jury instructions, as a whole, adequately state North Dakota law.

## III.

The District Court misapplied North Dakota's discovery rule when it failed to instruct the jury that there must be some harm, such as contamination, beyond the mere discovery of the presence of asbestos, for the statute of limitations to begin to run. The District Court also erred in excluding key pieces of evidence offered by MDU: the 1943 Cellufloc trademark and the summary of the "Asbestosis" article, exhibit P–83A. Therefore, we reverse and remand for a new trial in accordance with this opinion.

---

12. Stating that an improper foundation was laid is often another way of saying that the document was not properly authenticated. However the issue is phrased, the analysis is the same. Rule 901(a) provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." To satisfy this requirement, MDU needed only to demonstrate a rational basis for its claim that the evidence is what MDU says it is. *United States v. Long*, 857 F.2d 436, 442 (8th Cir.1988), *cert. denied*, —— U.S. ——, 112 S.Ct. 98, 116 L.Ed.2d 69 (1991).

13. Rule 611(b) provides: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

14. The Comment to subdivision (c) states: "The purpose of the qualification 'ordinarily' is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact...."