

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-20-2004

# Prudential Ins Co v. US Gypsum Co

Precedential or Non-Precedential: Precedential

Docket No. 02-3837

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Prudential Ins Co v. US Gypsum Co" (2004). *2004 Decisions.* Paper 946.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/946

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

NO. 02-3837

_____

PRUDENTIAL INSURANCE
COMPANY OF AMERICA;
PIC REALTY CORP;
745 PROPERTY INV

v.

UNITED STATES GYPSUM
COMPANY; W.R. GRACE &
COMPANY; THE CELOTEX
CORPORATION; UNITED STATES
MINERAL PRODUCTS COMPANY;
KEENE CORPORATION; PFIZER,
INC.; ASBESTOSPRAY
CORPORATION; JOHN DOE
COMPANIES, fictitious names for
presently unidentified entities

(District of New Jersey Civil No.
87-cv-4227)


THE PRUDENTIAL INSURANCE
COMPANY

v.

NATIONAL GYPSUM COMPANY

(District of New Jersey Civil No.
87-cv-4238)

The Prudential Insurance
Company of America,
PIC Realty Corporation and
745 Property Investments,

Appellants

_____

On Appeal from the United States
District Court for the District
of New Jersey
(D.C. Civil Nos. 87-cv-04227
and 87-cv-04238)
District Judge: Hon. Harold A.
Ackerman

_____

Argued September 3, 2003

Before: SLOVITER, NYGAARD and
ROTH, Circuit Judges

(Filed: February 20, 2004)

_____


Robert J. Gilson   (Argued)
Khaled J. Klele
Riker, Danzig, Scherer, Hyland &
    Perretti
Morristown, NJ 07962

David Boies
Robin A. Henry
Boies, Schiller & Flexner
Armonk, NY 10504

Attorneys for Appellants

Kell M. Damsgaard
Kevin M. Donovan   (Argued)
Morgan, Lewis & Bockius
Philadelphia, PA 19103

       Attorneys for Appellee
       US Gypsum Company

Nancy McDonald
Meredith Walling
McElroy, Deutsch & Mulvaney
Morristown, NJ 07962

       Attorneys for Appellee
       US Mineral Products

OPINION OF THE COURT

SLOVITER, Circuit Judge.

This case, one of the myriad asbestos cases that have besieged the courts, both state and federal, comes to us from a somewhat different perspective than most of the others. The plaintiffs, The Prudential Insurance Company of America, PIC Realty Corporation, and 745 Property Investments (hereinafter referred to collectively as "Prudential"), are owners and operators of buildings that installed asbestos-containing materials ("ACMs") that sued asbestos manufacturers to recover the costs of monitoring and remediation. Prudential appeals the District Court's orders granting the motions of defendants United States Gypsum Company ("Gypsum") and United States Mining Company ("USMP") for summary judgment dismissing Prudential's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., as time-barred by the statute of limitations. Prudential argues that the District Court erred in applying the "injury discovery rule" in ascertaining when Prudential's RICO claims began to accrue, that there exist disputed issues of material fact concerning when Prudential knew or should have know of its injuries from ACMs in its properties, and that the statute of limitations for Prudential's RICO claims should have been tolled due to Gypsum's active and fraudulent concealment of known health risks associated with ACMs. We will affirm.

**INTRODUCTION**

Prudential, a mutual insurance company, is one of the largest life, property, and casualty insurance underwriters in the world. It is also one of the largest real estate investors in North America, maintaining from the 1970s to the early 1980s "the largest real estate portfolio of any company in the world" with hundreds of commercial real estate properties. App. at 394a. Gypsum and USMP previously engaged in the manufacturing and sale of ACMs. Their products were widely used as construction materials throughout the United States.

Prudential contends that ACMs manufactured by both Gypsum and USMP, as well as other defendants not parties to this appeal, were used for fireproofing in

at least eighteen of its buildings.[1] According to Prudential, it only began to appreciate the hazards associated with in-place asbestos in 1984 at the time it had to remove ACMs from one of its properties, the Chubb Building in Short Hills, New Jersey, before its demolition. The ACMs were removed at a cost of approximately one million dollars. In late 1984, Prudential established a task force to investigate the in-place ACMs in its buildings. A Prudential internal survey conducted between 1985 and 1986 discovered that most of the buildings involved in this litigation, as well as approximately 100 others, contained ACMs. As a result, Prudential incurred hundreds of millions of dollars in expenses relating to the maintenance, testing, and removal of ACMs in its buildings. It has refused to acquire or mortgage properties containing ACMs since 1986.

Asbestos had, however, already become a well-known and important public health and safety issue in the United States prior to 1984. In April 1973, the Environmental Protection Agency ("EPA") established a National Emission Standard for Asbestos that severely restricted the manufacturing and application of ACMs, as well as the demolition of buildings containing fireproofing and insulation ACMs. 38 Fed. Reg. 8829 (Apr. 6, 1973). That standard regulated spray-on ACMs by limiting the concentration of asbestos in such ACMs and forbidding the visible emission of such materials to the outside air during the spraying process. Id. at 8830. It also required that "[a]ny owner or operator of a demolition operation who intends to demolish any institutional, commercial, or industrial building . . . which contains any boiler, pipe, or lead-supporting structural member that is insulated or fireproofed with friable asbestos material" shall notify the EPA in advance of the demolition and follow proper ACM-removal procedures set forth in the standard. Id. at 8829. In 1975, the EPA expanded this National Emission Standard to cover renovation activities involving buildings containing ACMs by mandating specific notification and removal procedures for such in-place ACMs. 40 Fed. Reg. 48,299-,300 (Oct. 14, 1975). It further amended the standard in 1978 to "extend coverage of the demolition and renovation provisions . . . to all friable asbestos materials and extend the scope of the asbestos spraying provisions . . . to all materials that contain more than 1 percent asbestos." 43 Fed. Reg. 28,372 (June 19, 1978).

The EPA also published various guidelines and regulations on asbestos management. One such EPA document from 1978, titled "Hazard Abatement from Sprayed Asbestos-Containing Materials in Buildings: A Guidance Document" that

---

[1] Although Prudential's initial claims covered approximately sixty-one buildings, that number was reduced to eighteen buildings by the time the District Court entered a Final Pretrial Order in 1996.

was prepared "for those involved in the use, removal, and disposal of asbestos materials in the building trades," states that "[a]sbestos in all its forms is considered a serious respiratory hazard. . . . Unlike most chemical carcinogens, the mineral fibers persist in the environment almost indefinitely and, when present in a building space open to its occupants, represent a continuous source of exposure." App. at 439a. The document also includes information on asbestos exposure, control, containment, and removal. App. at 480a-500a. The EPA issued a similar "guidance document" for ACMs in school buildings in 1979 and another report on controlling friable ACMs in buildings in March 1983. App. at 556a-626a, 736a-817a.

In addition, the Occupational Safety and Health Administration ("OSHA") had issued regulations on construction workers' exposure to asbestos. The imposition of these regulations and the increasing public debate regarding the health hazards of asbestos led various asbestos manufacturers, including Gypsum, to disseminate additional information regarding the use and risks of ACMs.

As Gypsum correctly states in its brief:

> In sum, before October 20, 1983, not only had the federal government (OSHA and EPA) issued mandatory regulations regarding

asbestos products in buildings, but the EPA had issued numerous guidance documents detailing for building owners the widespread use of asbestos-containing building materials, the association between asbestos exposure and disease, the potential risks of in-place asbestos-containing products, methods to detect asbestos, and recommendations for proper actions to be taken once asbestos-containing products are identified.

Appellee Gypsum's Br. at 13.

There is record evidence that various Prudential employees were aware of the existence of ACMs in at least some of Prudential's properties prior to 1984. Arcadius E. Zielinski, an architect formerly in Prudential's Corporate Services and Building Department, testified in a deposition that he surveyed filed specifications of Prudential's home office buildings to determine whether they contained ACMs. He stated that he told the Vice President of Prudential's Corporate Services and Building Department in May 1981 that such ACMs would not be hazardous so long as they were firm and remained in-place. An affidavit of David Holick, Jr., the director of architecture at Prudential's real estate investment department in Houston from 1979 to 1984, states that ACMs were a

4

topic discussed among some of Prudential's employees. In addition, asbestos testings were conducted, either by or at the request of local tenants, in several of Prudential's buildings prior to 1984. For example, in 1979 IBM Corporation, as tenant, tested the airborne asbestos levels at Prudential's Jacksonville, Florida building and forwarded the results to Prudential. App. at 48a-49a, 1053a-1151a. Asbestos testing was also conducted at least twice on the premises of Five Penn Center in Philadelphia prior to 1981. Similar asbestos testings were also conducted in several Prudential buildings not at issue in this litigation.

Prudential initiated this action on October 20, 1987 in the United States District Court for the District of New Jersey, asserting a claim under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and state claims under theories of absolute liability, strict liability, negligence, breach of express and implied warranties, fraud, misrepresentation, fraudulent concealment, unfair and deceptive trade practices, civil conspiracy, restitution, and indemnification. App. at 11,097a-11,153a. The District Court, upon motions by defendants, dismissed Prudential's CERCLA claim, but granted Prudential's motion for leave to amend its complaint to add claims under the RICO statute. Prudential Ins. Co. of Am. v. U.S. Gypsum Co., 711 F. Supp. 1244 (D.N.J. 1989). Prudential's RICO claims thus form the sole basis for federal subject matter jurisdiction in this case.

In its First Amended Complaint, Prudential alleged that ACMs manufactured by defendants and used in its properties pose a potential health risk, and that it has expended and will continue to expend resources to inspect, monitor, maintain, and abate any problems caused by the presence of ACMs. It also asserted past and future damages resulting from actual property damages, diminution of property values, loss of rental income, and disruption to tenants' businesses. App. at 11,107a-08a.

After several years of discovery, Gypsum and W.R. Grace, another defendant, filed a motion for summary judgment in October 1991 to dismiss Prudential's RICO claims on both substantive and statutes of limitations grounds. They also sought to dismiss Prudential's state law claims based on statutes of limitations. Prudential, in turn, filed a motion to strike defendants' statute of limitations defenses. The District Court, in a published opinion dated July 21, 1993, denied defendants' motion for summary judgment to dismiss Prudential's RICO claims on substantive grounds and also denied Prudential's motion to strike defendants' statute of limitations defenses. Prudential Ins. Co. of Am. v. U.S. Gypsum Co., 828 F. Supp. 287 (D.N.J. 1993). Focusing on the causation requirement of a RICO claim, the District Court stated that it "cannot rule as a matter of law" that causation did not exist between defendants' alleged violations and

Prudential's injuries. Id. at 296. It also ruled that "there are disputed issues of fact as to whether Prudential actually knew of its injury prior to 1984; and . . . the defendants are entitled to argue to a jury that Prudential should have known of its injury prior to 1984." Id. at 297.

On June 9, 1994, the District Court denied the motion for summary judgment by Gypsum and another defendant, Asbestospray Corporation, to dismiss Prudential's RICO claims on statute of limitations grounds, finding that disputed issues of material fact existed as to whether Prudential had knowledge of the elements of its RICO claims more than four years prior to filing the suit. Prudential Ins. Co. of Am. v. U.S. Gypsum Co., No. 87-4238 (D.N.J. June 9, 1994). Based on its 1993 ruling, the District Court also reserved the issue of what Prudential should have known for trial. The District Court then denied defendants' summary judgment motions dismissing Prudential's state law claims, although it did dismiss Prudential's breach of warranty claims.

The parties proceeded to complete pretrial discovery, and the District Court entered its Final Pretrial Order in 1996. Thereafter Gypsum, joined by W.R. Grace, filed summary judgment motions to dismiss Prudential's RICO claims on statute of limitations and substantive grounds.[2] USMP joined in these motions.

After oral argument, the District Court on June 20, 2001 granted Gypsum's motion for summary judgment dismissing Prudential's RICO claims as barred by the statute of limitations. It also granted the motion with respect to USMP on July 12, 2001. Noting developments subsequent to its 1993 and 1994 opinions in both the Supreme Court and this court regarding when a civil RICO claim accrues, the District Court held that Prudential "should have known" of its injury before October 20, 1983, the relevant date for purposes of the four-year RICO statute of limitations. Prudential Ins. Co. of Am. v. U.S. Gypsum Co., Nos. 87-4227, 87-4238 (D.N.J. June 20, 2001). In stating that "it should not have reserved the issue of what Prudential should have known [regarding its RICO claims] for trial" in its 1994 opinion, the District Court explained:

> While Prudential's 1993 motion for summary judgment raised the issue of whether Grace and Gypsum could provide evidence sufficient to show that Prudential should have known of its injuries, Grace and Gypsum's 1994 motion for summary judgment asked a different question:

[2] Subsequent to the filing of these motions, W.R. Grace filed a petition for voluntary relief pursuant to Chapter 11 of the United States Bankruptcy Code. This action therefore was automatically stayed as to W.R. Grace pursuant to 11 U.S.C. § 362(a).

6

whether Prudential could provide evidence sufficient to refute the claim that it should have known of its injuries.

App. at 34a (emphasis in original).

The District Court then concluded that based on its reconsideration of the record and facts before it, and in light of changes in the law regarding the accrual period under RICO, Prudential did not satisfy its summary judgment burden with respect to that latter question. App. at 53a. Having thus dismissed Prudential's only federal claim, the District Court declined to exercise supplemental jurisdiction and dismissed Prudential's remaining state law claims against Gypsum and USMP without prejudice. Shortly thereafter, both Gypsum and USMP filed for bankruptcy.

Prudential timely appealed the June 20, 2001 order after securing a stay of Gypsum's and USMP's federal bankruptcy proceedings as well as certification by the District Court under Federal Rule of Civil Procedure 54(b). The only issue on appeal is whether the District Court erred in dismissing, on summary judgment, Prudential's RICO claims as time-barred.

## JURISDICTION AND STANDARD OF REVIEW

The District Court properly exercised jurisdiction over this action under 28 U.S.C. § 1331 based on Prudential's claims arising under RICO.

The District Court also had supplemental jurisdiction over Prudential's state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction over the District Court's final judgment pursuant to 28 U.S.C. § 1291.

We exercise plenary review of a district court's grant of summary judgment. SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir. 1997). Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## DISCUSSION

Although the RICO statute does not expressly provide a statute of limitations, the Supreme Court, by analogy to the Clayton Act, has established a four-year limitations period for civil RICO claims. Agency Holding Corp. v. Malley-Duff & Assoc. Inc., 483 U.S. 143, 156 (1987). Prudential filed this action on October 20, 1987. Therefore, we may uphold the District Court's summary judgment order only if the statute of limitations for Prudential's RICO claims did not begin to accrue before October 20, 1983.

A.    Test for Accrual of Civil RICO Claims

In Malley-Duff, the Supreme Court

7

left open the question of when the statute of limitations for civil RICO claims begins to accrue. It has not resolved that issue but it has rejected several standards this court had used to determine when the RICO statute of limitations period accrues. Although most of the Courts of Appeals at that time applied forms of an "injury and pattern discovery rule" for determining the accrual of RICO claims, this court applied a "last predicate act" exception under which "[if], as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, . . . the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same 'pattern.'" Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1126 (3d Cir. 1988). In Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997), the Supreme Court rejected the Third Circuit exception. The Court reasoned that such a test would result in a limitations period longer than that which Congress could have contemplated, as well as would improperly allow claimants to recover for injuries outside of the limitations period by "bootstrapping" them onto a later and independent predicate act. Klehr, 521 U.S. at 187-90.

A few years later, in Rotella v. Wood, 528 U.S. 549 (2000), the Supreme Court also rejected the "injury and pattern discovery rule" itself, under which the

statute of limitations begins to run when the plaintiff knew or should have known that each element of a civil RICO claim existed: the injury, the source of the injury, and the pattern of activities prohibited under RICO causing the injury. Id. at 554. However, the Court did not "settle upon a final rule," noting that among available remaining alternatives were the injury discovery rule and the injury occurrence rule. Id. at 554 n.2.

After Rotella, we adopted the injury discovery rule in Forbes v. Eagleson, 228 F.3d 471 (3d Cir. 2000), holding that in determining statute of limitations issues in civil RICO claims "we must determine when the plaintiffs knew or should have known of their injury." Id. at 484. In addition to the injury, the plaintiffs must also have known or should have known of the source of their injury. Id. at 485. As we explained in Forbes, "nothing more" than these two requirements "was required to trigger the running of the four-year limitations period [of a civil RICO claim]." Id. (citations omitted).

Prudential does not dispute that the injury discovery rule is the governing legal standard in this case. It quarrels, rather, with that rule's application in this case. Specifically, Prudential argues that, based on the record of this case, it could not have known its injuries prior to October 20, 1983, and that in any event, the injury it suffered must be an "actual" injury before the statute of limitations is triggered.

B.      Whether Prudential Should Have

Known of Its Injuries Prior to October 20, 1983

To evaluate Prudential's argument, we start by looking to the injury it alleged in its amended complaint. App. at 11,097a-11,153a. In that complaint, Prudential alleges injuries:

>relating to abatement and building monitoring actions, building survey and testing costs, tenant relocation costs, operations and maintenance program costs for asbestos-containing materials before their removal from buildings, substantial disruption to their business, substantial property damage to their property (such as carpeting, ceilings, curtains, etc.), and other costs associated with the contamination or potential contamination of the buildings. Plaintiffs have also suffered and will suffer, among other damages, the loss of rental income from the buildings during abatement procedures or due to premature tenant departures, and the diminution in the commercial value of the properties.

App. at 11,108a (emphasis added). This language explicitly states broad injuries that included both past and future harm to Prudential. More specifically, the complaint alleges injuries that include prospective damages for complying with federal regulations concerning the renovation, alteration, or demolition of buildings containing ACMs:

>Because of the potential health and contamination dangers, plaintiffs have been compelled to determine the extent to which asbestos-containing materials are present in their buildings and the extent to which the buildings and their contents have been or may be contaminated with asbestos fibers. Where such materials or contamination have been or are found, plaintiffs have adopted or will have to adopt, pursuant to governmental regulations and common-law duties, costly abatement measures to remove and replace, enclose, encapsulate, or repair such materials in order to eliminate the potential asbestos health hazard created by such contamination of the buildings.

App. at 11,107a. Prudential's amended complaint thus seeks recovery for both past and future injuries caused by the presence of ACMs in Prudential's

9

properties.

In holding that Prudential has not, and could not, produce evidence sufficient to refute the defendants' claims that Prudential should have known of the injury it alleged in its amended complaint prior to October 20, 1983, the District Court reviewed government regulations and publications as well as evidence pertinent to Prudential's own buildings and employees regarding the hazards of ACMs and related precautions. Some of the evidence examined by the District Court is recited in the introductory section of this opinion. In reviewing the effect of government information regarding asbestos on Prudential's awareness of ACM hazards, it is important to note that Prudential is a very sophisticated company that operates a large casualty insurance business and an extensive estate investment business. Such a sizable business operation not only provided Prudential with more opportunities than an average plaintiff to access ACM-related information, but it should have also given Prudential a greater incentive to diligently research and investigate any potential injuries it may suffer through the presence of ACMs in its own properties. As the District Court correctly pointed out, because Prudential's liability exposure was magnified by the large size of its real estate portfolio, "prudence dictates that Prudential should have remained informed of its legal responsibilities." App. at 43a.

Nor was Prudential obliged to rely solely on government warnings. Multiple incidents and tenant complaints in Prudential's own buildings should have also provided Prudential notice of the ACM-related injuries it alleges in the amended complaint. At Five Penn Center in Philadelphia, Prudential knew that the ACMs were used for fireproofing, and that the ACMs were sources of potential future hazards; it sent a letter on September 29, 1976 to the building's seller, giving formal notice that the seller was in breach of the Agreement of Sale because, among other things, "it appears that the building was in violation of law pertaining to concentration of air-borne asbestos on and prior to the date of settlement under said Agreement of Sale." App. at 936a. Colonial Penn, a major tenant in the building, complained in 1981 that ACMs fell from ceiling in one of its offices, and Prudential incurred cleaning and encapsulating expenses related to the incident.

Similarly, Prudential was aware of the presence of ACMs in the IBM Building in Jacksonville, Florida as early as 1979, when tenant IBM requested Prudential's assistance in surveying the fireproofing material in the building. Based on its own testing, IBM informed Prudential in January 1980 that a sample of the fireproofing material contained six percent of Chrysotile asbestos. App. at 1055a. At Prudential's own request, IBM forwarded a copy of its asbestos and air sample analyses to Prudential in March 1980. These incidents and tenant complaints, combined with government information, should therefore have

10

provided Prudential inquiry notice regarding the potential hazards of ACMs in its properties.[3]

Despite the facts supporting the District Court's legal conclusion, Prudential argues that because these incidents did not reflect actual contamination prior to 1984, they do not show the same type of injuries for which Prudential currently seeks damages. It contends that pre-1984 government regulations and information were not directly related to in-place ACMs, and that its actions with respect to building tenants merely demonstrated business decisions to placate tenants rather than actual awareness of potential hazards related to ACMs. These contentions are to support Prudential's principal argument that it had no reason to know of its ACM-related injuries until it took on the demolition of the Chubb Building in 1984, when ACMs in that building released sufficient asbestos fibers so as to contaminate its building.

_____

[3] As the proprietor of a large real estate portfolio, Prudential should have also become aware of ACM-related hazards through the existence of ACMs in other Prudential properties not at issue in this litigation. Evidence show, for example, that Prudential was aware of the presence of ACMs in Prudential Center, Boston as early as 1978; it received multiple inquiries and from tenants, OSHA, and the Massachusetts Office of Occupational Hygiene regarding ACM-related issues. App. at 50a-51a, 1006a-25a.

We note, however, that the injury discovery rule in <u>Forbes</u> allows the limitations period of civil RICO claims to accrue not only if Prudential actually knew of its injuries, but also if Prudential should have known of its injuries. <u>Forbes</u>, 228 F.3d at 484. As the District Court explained in its opinion, because Gypsum and USMP in support of their motions for summary judgment provided sufficient evidence that Prudential "should have known" before October 20, 1983 of the injuries it alleged in the amended complaint, Prudential was required to provide sufficient evidence to refute that claim in order to defeat summary judgment. Given the above facts, we agree with the District Court that:

> Prudential's showing regarding its actual knowledge falls far short . . . of demonstrating why Prudential remained unaware of the potential hazard asbestos posed in its holdings. While the court may accept for the purposes of this motion that Prudential was not aware of the EPA's repeated warnings about the potential hazards of in-place asbestos . . . such events should have triggered Prudential's inquiry into the hazards posed by asbestos.

App. at 37a. For example, the EPA regulations on the removal of asbestos

11

during building demolitions were promulgated in the 1970s. Therefore even if the demolition of the Chubb Building in 1984 was the first demolition of any of Prudential's buildings, it should have had prior awareness, as a major real estate investor, of the regulations and the ACM-related danger to which they were aimed. As stated in an EPA training document from February 1983:

> A building owner might choose to believe there is no problem in his/her building, but, as we have seen, it is clearly prudent to find out the facts. With the rising public awareness of asbestos hazards, most any building owner would be hard pressed to justify no reasonable knowledge of the hazard.

App. at 46a.

Prudential also admits that some of its own employees "had some awareness of asbestos as an issue in certain of Prudential's buildings during the late 1970s and early 1980s." Appellants' Br. at 34. We therefore agree with the District Court that Prudential should have known of the injuries alleged in its complaint prior to October 20, 1983.

C.  Prudential's "Actual Injury" Argument

In addition to its factual contentions regarding the timing of its awareness of ACM-related hazards, Prudential argues that the Forbes standard requires actual, rather than potential, harm to a civil RICO plaintiff. It asserts that it suffered no injuries either from its knowledge of the existence of in-place ACMs in its properties or from the risk of injuries stemming from those ACMs. Prudential asserts that ACMs only cause injury when they deteriorate and begin releasing hazardous levels of asbestos fibers that contaminate buildings, and therefore it suffered injury only when actual contamination required it to address or remedy the hazards such contaminations posed. Appellants' Br. at 21-22.

As we previously noted, Prudential's amended complaint clearly seeks damages for both past and future injuries. Consequently, Prudential cannot also argue that the statute of limitations for its RICO claims should not have begun to run until those injuries became "actual" injuries and it needed to take remedial measures and incurred expenses for remediation. Such a legal rule would place too much discretion in the plaintiff's hands, and would be antithetical to the "basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." Rotella, 528 U.S. at 550. RICO's provision of a civil remedy was enacted to "turn [plaintiffs] into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity. . . . It would, accordingly, be

12

strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize." Id. at 557-58. Prudential's proposed "actual injury" standard would allow a civil RICO plaintiff to control when the relevant limitations periods accrue through its timing of the assessment, investigation, and correction of its injuries, thereby producing precisely the long limitations periods frowned upon in Rotella.

Prudential cites, as support for the "actual injury" standard it puts forth, several federal and state cases supporting its argument that in-place ACMs only cause injuries when they release hazardous levels of asbestos fibers into buildings. Appellants' Br. at 20-22. We note, however, that it is Prudential itself that chose to pursue redress under RICO for both monitoring and testing costs associated with potential contamination as well as costs for abatement and repair in its amended complaint. In contrast, the plaintiffs in the cases cited by Prudential confined their claims to costs of remediation, and pursued their redress through state-law claims that require different accrual analyses than used in RICO cases. The plaintiffs in Port Authority of New York and New Jersey v. Affiliated FM Insurance Co., 311 F.3d 226 (3d Cir. 2002), for example, pursued their asbestos claims under New Jersey state law based on first-party insurance contracts rather than on RICO or tort liability grounds. They also sought recovery only "for expenses incurred in conjunction with the abatement of asbestos-containing materials in their structures . . . ." Id. at 230. The injury analysis in that case, therefore, turned on the interpretation of contract provisions rather than on any statute of limitations.

Similarly, the plaintiff in MDU Resources Group v. W.R. Grace and Co., 14 F.3d 1274 (8th Cir. 1994), filed claims under North Dakota state-law theories of negligence, strict liability, failure to warn, and breach of warranty, and only sought recovery for the costs of removing ACMs from one of its buildings. Id. at 1276. The MDU court, therefore, focused on actual asbestos contamination as the point when injury occurs, because under North Dakota's economic-loss doctrine MDU could not have brought suit until the only injury it asserted – the ACM-removal costs it already incurred – materialized. See id. at 1279 n.8 (suggesting that the statute of limitations could have begun to run earlier had MDU claimed different injuries).

The different legal principles governing the claims and the limited scopes of injury involved in these cases required different considerations for calculating statute of limitations periods that are not applicable to Prudential's broad RICO claims here. We therefore join the District Court in rejecting Prudential's "actual injury" concept as it relates to the accrual of the statute of limitations for Prudential's civil RICO claims.

D.    Fraudulent Concealment

Finally, Prudential contends that the statute of limitations should have been equitably tolled because defendants fraudulently concealed from Prudential that it could be or had been injured by in-place ACMs manufactured by defendants. It argues that despite long-standing knowledge of the adverse health effects of asbestos, defendants did not publicly disclose these risks and instead advertised their products as safe in pamphlets, brochures, direct mailing catalogs, and other forms of advertisement. Prudential contends that because of these efforts by defendants to conceal hazards associated with ACMs, there exists a genuine issue of material fact regarding fraudulent concealment that is sufficient to toll the limitations period for its RICO claims. Appellants' Br. at 9-14.

In Forbes, we held that fraudulent concealment could be a basis for equitably tolling the RICO limitations period. 228 F.3d at 486-88. At the summary judgment stage, a court must determine:

> (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their. . .claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, and

(3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint.

Id. at 487 (emphasis in original).

The Supreme Court has stated that to equitably toll the running of a limitations period in the civil-RICO context by claiming fraudulent concealment, plaintiffs must have exercised "reasonable diligence" to discover their claim. Klehr, 521 U.S. at 194. We also stated in Mathews v. Kidder, Peabody & Co., Inc., 260 F.3d 239 (3d Cir. 2001), where we rejected an equitable tolling claim after finding that the plaintiff should have known of its injuries, that "[i]n order to avoid summary judgment, there must be a genuine issue of material fact as to whether the Appellants exercised reasonable due diligence in investigating their claim." Id. at 257.

We conclude that Prudential has failed to satisfy the Forbes standard for tolling the limitations period for its RICO claims. Even assuming, as the District Court did, that Gypsum engaged in fraudulent concealment, Prudential had not demonstrated that it exercised reasonable diligence in discovering or investigating its

14

injuries. As the discussion above shows, irrespective of defendants' attempts to conceal from Prudential the hazards posed by ACMs in Prudential's buildings, Prudential had many other sources of information sufficient to place it on inquiry notice of such ACM-related injuries. Prudential should have, for example, given heed to government warnings and regulations to undertake surveys and testing of its buildings. Moreover, as we noted in Mathews, "to determine what constitutes 'reasonable' due diligence [for determining if a plaintiff should have known of its injury], we must consider the magnitude of the existing storm warnings. The more ominous the warnings, the more extensive the expected inquiry." 260 F.3d at 255. Here, given the magnitude of Prudential's commercial real estate investments and the significance of the threat ACMs posed to that investment, a substantial and diligent investigation by Prudential was called for prior to October 20, 1983. Its failure to have undertaken such an investigation regarding ACM-related hazards was, as a matter of law, the failure to exercise due diligence. We therefore conclude that the limitations period for Prudential's RICO claims was not tolled under a fraudulent concealment theory.

## CONCLUSION

For the foregoing reasons, we will affirm the District Court's orders granting Gypsum and USMP summary judgment on statute of limitations grounds and dismissing Prudential's remaining state law claims without prejudice.

---

15